[No. S037469. Feb. 2, 1995.]

In re HARRY M. SASSOUNIAN on Habeas Corpus.

## COUNSEL

Talcott, Lightfoot, Vandevelde, Woehrle & Sadowsky, Michael J. Lightfoot, Cleary & Sevilla and Charles M. Sevilla for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Cheif Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey, William T. Harter and David F. Glassman, Deputy Attorneys General, for Respondent.

Gil Garcetti, District Attorney, George M. Palmer, Chief Deputy District Attorney, Andrew J. McMullen and William B. Patrick, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**MOSK, J.**—This proceeding arises out of a petition for writ of habeas corpus filed in this court by Harry M. Sassounian seeking to vacate a judgment of the Superior Court of Los Angeles County.

### I

The judgment under challenge was rendered after jury trial in a capital prosecution that received widespread publicity, within California and without. The subject of the proceeding was the killing of Kemal Arikan, the Consul General of the Republic of Turkey at Los Angeles and a Turkish national, which took place in the Westwood area of that city.

At the guilt phase, there was no substantial dispute that Arikan was the victim of assassination. It was his custom to leave his residence about 9:30 a.m. in a white Ford LTD with consular corps license plates, passing along nearby Comstock Street to its intersection with Wilshire Boulevard, and then on to his office at the Turkish consulate. On Thursday, January 28, 1982, he followed his custom. Around the time he left his residence, two men took up positions at the Wilshire-Comstock intersection, one on the southwest corner and the other on the southeast; they stood very close to the thoroughfare, staring eye to eye across Comstock Street, which had a traffic signal that remained red unless activated by a vehicle detector or a pedestrian cross-button. Not long thereafter, Arikan approached the intersection in his automobile. Straightway, the two men descended on him and his vehicle; the man formerly on the intersection's southwest corner moved toward the driver side, with a 9-millimeter pistol in one of his hands; the man formerly

on the intersection's southeast corner moved toward the passenger side, with a .45-caliber pistol apparently in his left hand; they made no attempt whatsoever to seize Arikan or to take any of his possessions; rather, they opened fire at close range and proceeded to empty their magazines, striking Arikan several times in the head and chest; they immediately ran from the scene, tossed away their weapons, and fled in a gray Chevrolet Nova bearing California license plate No. 534 TER. Within minutes, Arikan died of his wounds.

Although there was no substantial dispute that Arikan was the victim of assassination, there *was* substantial dispute whether petitioner was one of his assassins.

The prosecution called various witnesses who told a tale to the following effect. Petitioner is of Armenian heritage. On the date of the Arikan assassination, he was 19 years of age and had lived in the United States about 5 years, having emigrated with his family from Beirut as a result of the Lebanese civil war. Apparently, he was not personally acquainted with Arikan. According to one of his brothers, as recounted by a police officer, he "had bad feelings towards the Turkish people for the things that they had done [to Armenians] in the past," and he held the view that "Turks are animals." He was identified by eyewitnesses as standing on the southeast corner of the Wilshire-Comstock intersection before the assassination and as fleeing from the scene afterward. One of his friends, Krikor Saliba, who was also of Armenian heritage, was identified by eyewitnesses as standing on the southwest corner of the intersection before the assassination and as fleeing from the scene afterward. Petitioner was the registered owner of the gray Chevrolet Nova bearing California license plate No. 534 TER, which was used for flight, and did not allow anyone else to drive the vehicle. On his arrest within hours of the assassination, he bore on his left hand material that was later found to be consistent with gunshot residue. Saliba was not apprehended.

The prosecution also called Jeffrey Scott Busch. Busch testified that petitioner had assertedly made a full confession to him one day, of a sudden, while they were both inmates in the Los Angeles County jail, apparently as Busch was peddling cigarettes—Busch working as a trusty with relative freedom of movement around the jail, petitioner waiting to be transported to court, the 2 conversing between 10 and 20 minutes, for the first and only time, through what Busch said was the open-barred door of the cell in which petitioner was being held on the so-called "court line." At its core, the "confession" related that petitioner participated in the Arikan assassination together with, according to Busch, *two* partners; it also related that petitioner

acted with an anti-Turkish motive. Busch's testimony was directly corrobo-
rated, in part, as to the fact of the "confession" by another inmate, who said
he heard petitioner mention "murder" to Busch. It was circumstantially
corroborated, in part, as to the substance of the "confession" by one of the
eyewitnesses at the Wilshire-Comstock intersection, who said the man on the
southwest corner kept looking toward a hotel along Arikan's customary
route—which in the prosecution's view suggested the participation of a third
person, in addition to petitioner and Saliba, as a spotter on the hotel's roof.
Busch generally denied that he had "prepared" his testimony with the help of
others, including the authorities and fellow inmates.

Without taking the stand himself, petitioner put forth a defense of alibi
and mistaken identity. In addition, he attacked Busch's testimony as fabri-
cated. To that end, he subjected Busch to extensive impeachment and also
exploited the similarly extensive impeachment to which the prosecution had
already subjected Busch in anticipation. He made the following points,
among others.

As to the fact of the "confession," Busch was apparently dubious on the
circumstances. There was at least some question whether he was in fact a
trusty; whether he could have been walking on the "court line," selling
cigarettes, and talking to other inmates, all in violation of regulations, under
the very eyes of the jailers; whether he would have been allowed to engage
petitioner in conversation, extended or otherwise, inasmuch as petitioner was
in "keep-away" custody in a high-profile murder case; whether he would
have been given a confession by petitioner, who had never met him previ-
ously and was surrounded by jailers; and whether he could have taken a
confession from petitioner, who was apparently in a cell with a door that was
solid and closed, and not open-barred as he had stated.

As to the substance of the "confession," Busch was wrong on several
matters. He incorrectly identified the location of the Arikan assassination as
the Avenue of the Stars in Century City—which happened to be near the
former Turkish consulate, the address of which might have been obtained
from an out-of-date telephone directory. He incorrectly identified the weap-
ons used by the assassins as 9-millimeter pistols; as noted, they included a
.45-caliber pistol, which petitioner himself wielded. He incorrectly identified
the two partners he said acted with petitioner as bearing Armenian surnames
similar to "Tejerian" and "Yeghoian"; these surnames belonged to certain
persons, unconnected to the assassination, who happened to be former
acquaintances of a fellow jailhouse informant—a man who disclosed at trial
that he had schemed to fabricate testimony against petitioner.

In addition, Busch admitted that he had been convicted more than once of
the felony of burglary; that he was then in prison; that he had previously

acted as a jailhouse informant; that he had obtained information relating to the Arikan assassination from another inmate; that he did not immediately reveal petitioner's "confession" to the authorities and, when he did do so, did not reveal all its details; that he had been unable to identify petitioner in a photographic show-up; and that he had solicited—but claimed he had not received and did not expect—benefits and/or promises of benefits from the authorities (in the form of protection, change of identity, relocation, money, favorable disposition of criminal matters, etc.) in exchange for his testimony against petitioner.

Finally, Busch was confronted from the witness stand by other past and present inmates, who stated that his testimony was false and described how he engineered its fabrication.

The jury returned a verdict finding petitioner guilty of the first degree murder of Arikan. At the same time, it found true a national-origin special-circumstance allegation—specifically, that petitioner intentionally killed Arikan because he was Turkish—which enhanced punishment to either death or life imprisonment without possibility of parole.

At the penalty phase, the prosecution presented no evidence in aggravation, resting on what had been introduced at the guilt phase. For his part, again without taking the stand himself, petitioner presented evidence in mitigation, comprising testimony by his mother, an aunt, and a psychiatrist concerning his troubled background and his good character.

The jury returned a verdict fixing the punishment for petitioner at life imprisonment without possibility of parole.

In a reported decision, the Court of Appeal, Second Appellate District, Division Seven affirmed. (*People* v. *Sassounian* (1986) 182 Cal.App.3d 361 [226 Cal.Rptr. 880].) On guilt, the *Sassounian* court was unanimous. But on punishment, specifically, the national-origin special-circumstance finding and the dependent sentence of life imprisonment without possibility of parole, it was not. Apparently as a result of overhearing certain comments at a bench conference, some jurors received information they understood to concern a telephone call to the Turkish consulate threatening, or claiming responsibility for, the Arikan assassination. In this, two justices found juror misconduct but no prejudice. One justice found both, and would have reversed as to punishment. The court, however, was at one in rejecting a claim of insufficiency of the evidence against the national-origin special-circumstance finding—a point that was based on an assertion that Busch's testimony was "inherently incredible." (*Id.* at p. 408; see *id.* at p. 423 (conc.

& dis. opn. of Johnson, J.).) It did not itself purport to credit Busch's testimony, but merely could not conclude that it was "either physically impossible or demonstrably false without resort to inferences or deductions." (*Id.* at p. 409; see *id.* at p. 423 (conc. & dis. opn. of Johnson, J.).) We denied review.

Subsequently, petitioner filed a petition for writ of habeas corpus in the Superior Court of Los Angeles County, asking it to vacate its earlier judgment, based, in part, on a declaration by Busch recanting his testimony.[1] The court ordered the Director of Corrections to show cause why petitioner should not be granted the relief he sought. The Director of Corrections filed a return, based, in part, on a declaration by Busch recanting his recantation. Petitioner next filed a traverse. The Director of Corrections then filed a "response." The court proceeded to deny the petition on the merits.

Thereupon, petitioner filed in this court the petition for writ of habeas corpus out of which the present proceeding has arisen. This petition is substantially the same as that earlier filed in the Superior Court of Los Angeles County. After consideration, we ordered the Director of Corrections to show cause before the Court of Appeal, Second Appellate District, why petitioner should not be granted the relief he sought *as to punishment only*—specifically, the national-origin special-circumstance finding and the dependent sentence of life imprisonment without possibility of parole—on one or both of the following claims: (1) contrary to Penal Code section 1473, false evidence that was substantially material or probative on that issue had been introduced against him at trial, viz., Busch's testimony; and (2) in violation of the due process clause of the Fourteenth Amendment to the United States Constitution, the prosecution had not disclosed evidence that was favorable to him and material on that issue, viz., evidence impeaching Busch, including benefits and/or promises of benefits from the authorities in exchange for his testimony.

In the Court of Appeal, Second Appellate District, the proceeding was assigned to Division Seven. The Director of Corrections filed a return. Petitioner then filed a traverse.[2] The court ordered the matter submitted. It subsequently vacated the submission. Thereupon, it appointed a referee to conduct an evidentiary hearing in order to find whether Busch's testimony

---

[1]Petitioner apparently commenced or accelerated his habeas corpus investigation after the 1989-1990 Grand Jury of Los Angeles County published a report entitled, "Investigation of the Involvement of Jail House Informants in the Criminal Justice System in Los Angeles County" (hereafter the Jail House Informant Report), and after the District Attorney of Los Angeles County conducted a review of his case in light thereof.

[2]Petitioner requested the Court of Appeal to take judicial notice of the Jail House Informant Report. It did so.

was credible in light of his later recantation and his still-later recantation of his recantation.[3] After the evidentiary hearing, the referee found in the affirmative; but he also made various other "determinations" that were inflammatory or immaterial or both. In an unreported decision, the court proceeded to deny the petition on the merits. Two justices concluded that petitioner had failed to carry his burden of proof on either the false evidence or the prosecutorial nondisclosure claim, determining, inter alia, that the referee's finding on the credibility of Busch's testimony was supported by substantial evidence. One justice dissented—the same who had concurred and dissented on petitioner's appeal—stating that he had "serious reservations about whether the referee . . . adequately performed the mission he was assigned."

We granted review, and now affirm.[4]

II

The substantive law that governs this proceeding may be briefly stated, as follows.

■ Under the due process clause of the Fourteenth Amendment to the United States Constitution, a prisoner may seek relief in habeas corpus on the ground that the prosecution did not disclose evidence.

The prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence to a criminal defendant. (See, e.g., *United States* v. *Bagley* (1985) 473 U.S. 667, 674-678 [87 L.Ed.2d 481, 488-492, 105 S.Ct. 3375] [hereafter sometimes *Bagley*].)

But such evidence must be both favorable to the defendant and material on either guilt or punishment. (*United States* v. *Bagley, supra,* 473 U.S. at p. 674 [87 L.Ed.2d at pp. 488-489].)[5]

---

[3]Apparently, in the course of the evidentiary hearing, petitioner submitted, but our clerk refused to file, a motion for this court to expand the scope of the evidentiary hearing to cover the issue of guilt as well as that of punishment.

[4]Petitioner requests us to take judicial notice of the Jail House Informant Report. We may, of course, "take judicial notice" (Evid. Code, § 459, subd. (a)) of "[o]fficial acts of" any "legislative, executive, [or] judicial department[]" of this state (*id.,* § 452, subd. (c)) and also "[r]ecords of . . . any court of this state" (*id.,* § 452, subd. (d))—which effectively cover the document in question and its publication. We grant the request. (Cf. *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1259, fn. 54 [275 Cal.Rptr. 729, 800 P.2d 1159] [granting a similar request concerning the same document].)

[5]To the extent that California decisions construe the prosecution's duty to disclose evidence under the Fourteenth Amendment's due process clause more broadly (see, e.g., *People* v.

Evidence is "favorable" if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses. (See *United States* v. *Bagley, supra,* 473 U.S. at p. 676 [87 L.Ed.2d at p. 490].)

Evidence is "material" "only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different." (*United States* v. *Bagley, supra,* 473 U.S. at p. 682 [87 L.Ed.2d at p. 494] (lead opn. by Blackmun, J.), relying on *Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698 104 S.Ct. 2052] [dealing with ineffective assistance of counsel in violation of the Sixth Amendment]; accord, *United States* v. *Bagley, supra,* 473 U.S. 667, 685 [87 L.Ed.2d 481, 496] (conc. opn. of White, J.).) The requisite "reasonable probability" is a probability sufficient to "undermine[] confidence in the outcome" on the part of the reviewing court. (*United States* v. *Bagley, supra,* 473 U.S. 667, 678 [87 L.Ed.2d 481, 491-492]; accord, *id.* at p. 682 [87 L.Ed.2d at p. 494] (lead opn. by Blackmun, J.), relying on *Strickland* v. *Washington, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at pp. 697-698] [dealing with ineffective assistance of counsel in violation of the Sixth Amendment]; see *United States* v. *Bagley, supra,* 473 U.S. 667, 685 [87 L.Ed.2d 481, 496] (conc. opn. of White, J.).) It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. (See *United States* v. *Bagley, supra,* 473 U.S. at p. 685 [87 L.Ed.2d at p. 496] (conc. opn. of White, J.).) Further, it is a probability that is, as it were, "objective," based on an "assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision," and not dependent on the "idiosyncracies of the particular decisionmaker," including the "possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like." (*Strickland* v. *Washington, supra,* 466 U.S. at p.

---

*Morris* (1988) 46 Cal.3d 1, 30, fn. 14 [249 Cal.Rptr. 119, 756 P.2d 843] [hereafter sometimes *Morris*]), they are erroneous and are hereby disapproved. It is plain that the federal constitutional provision "requires disclosure [by the prosecution] *only* of evidence that is both favorable to the accused and 'material either to guilt or to punishment.' " (*United States* v. *Bagley, supra,* 473 U.S. at p. 674 [87 L.Ed.2d at pp. 488-489], italics added.) Hence, it is not correct to state, for example, that "the prosecution's duty of disclosure extends to *all* evidence that reasonably appears favorable to the accused . . . ." (*People* v. *Morris, supra,* 46 Cal.3d at p. 30, fn. 14, italics in original.) Although some of our decisions may contain ambiguous language, they are substantially sound, and should be read in conformity with *Bagley.* (See, e.g., *Izazaga* v. *Superior Court* (1991) 54 Cal.3d 356, 377-378 [285 Cal.Rptr. 231, 815 P.2d 304] [citing *Bagley,* but also quoting *Morris,* on the prosecution's duty to disclose evidence]; *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1272 [278 Cal.Rptr. 640, 805 P.2d 899] [citing *Morris* and not *Bagley* on the prosecution's duty to disclose evidence]; *People* v. *Hayes* (1990) 52 Cal.3d 577, 611 [276 Cal.Rptr. 874, 802 P.2d 376] [same]; *People* v. *Gonzalez, supra,* 51 Cal.3d at pp. 1240, 1260-1261 [same].)

695 [80 L.Ed.2d at p. 698] [dealing with ineffective assistance of counsel in violation of the Sixth Amendment].)[6]

Thus, to merit relief on this basis, the prisoner must show both the favorableness and the materiality of any evidence not disclosed by the prosecution, as defined above. (See *United States* v. *Bagley, supra,* 473 U.S. at pp. 674-678 [87 L.Ed.2d at pp. 488-492].)[7]

---

[6]To the extent that California decisions define the materiality of evidence under the Fourteenth Amendment's due process clause more broadly (see, e.g., *People* v. *Morris, supra,* 46 Cal.3d at p. 30, fn. 14; see also *In re Jackson* (1992) 3 Cal.4th 578, 595 [11 Cal.Rptr.2d 531, 835 P.2d 371] [declining to reconsider *Morris* as unnecessary on the record therein]), they are erroneous and are hereby disapproved. It is plain that the federal constitutional provision treats as material only such evidence as raises a "reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different" (*United States* v. *Bagley, supra,* 473 U.S. at p. 682 [87 L.Ed.2d at p. 494] (lead opn. by Blackmun, J.); accord, *id.* at p. 685 [87 L.Ed.2d at p. 496] (conc. opn. of White, J.))—that is to say, a probability sufficient to "undermine[] confidence in the outcome" (*id.* at p. 678 [87 L.Ed.2d at pp. 490-491]; accord, *id.* at p. 682 [87 L.Ed.2d at p. 496] (lead opn. by Blackmun, J.); see *id.* at p. 685 [87 L.Ed.2d at p. 496] (conc. opn. of White, J.)). Hence, it is not correct to state, for example, that "evidence is 'material' which 'tends to influence the trier of fact because of its logical connection with the issue.' " (*People* v. *Morris, supra,* 46 Cal.3d at p. 30, fn. 14.)

[7]A showing by the prisoner of the favorableness and materiality of any evidence not disclosed by the prosecution necessarily establishes at one stroke what in other contexts are separately considered under the rubrics of "error" and "prejudice." For, here, there is no "error" unless there is also "prejudice." (See *United States* v. *Bagley, supra,* 473 U.S. at p. 678 [87 L.Ed.2d at pp. 490-491] [holding that "a constitutional error occurs, and the conviction must be reversed, only if the evidence is [both favorable and] material in the sense that its suppression undermines confidence in the outcome"]; cf. *Strickland* v. *Washington, supra,* 466 U.S. at pp. 687-696 [80 L.Ed.2d at pp. 693-699] [holding that counsel's assistance is ineffective in violation of the Sixth Amendment, and the judgment must fall, only if counsel's performance is deficient and prejudicial].)

It follows that harmless-error analysis under *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065], with its standard of "harmless beyond a reasonable doubt," is not implicated. If the prisoner fails to show both the favorableness and the materiality of the evidence not disclosed by the prosecution, his custodian *need not* make any attempt to demonstrate that the prosecutorial nondisclosure was harmless beyond a reasonable doubt. Obviously, in such a situation, there is no "error" to be found harmless. But if the prisoner succeeds, his custodian *cannot* make any attempt of this kind. Under such circumstances, there is an "error" that is necessarily "prejudicial." That is because if the prisoner establishes "a reasonable probability that, had the evidence been disclosed to the defense, the result . . . would have been different" (*United States* v. *Bagley, supra,* 473 U.S. at p. 682 [87 L.Ed.2d at p. 494] (lead opn. by Blackmun, J.); accord, *id.* at p. 685 [87 L.Ed.2d at p. 496] (conc. opn. of White, J.)), that is to say, if he establishes a probability sufficient to "undermine[] confidence in the outcome" (*id.* at p. 678 [87 L.Ed.2d at pp. 490-491]; accord, *id.* at p. 682 [87 L.Ed.2d at p. 494] (lead opn. by Blackmun, J.); see *id.* at p. 685 [87 L.Ed.2d at p. 496] (conc. opn. of White, J.)), as a matter of necessity he establishes the prosecutorial nondisclosure was *not* harmless beyond a reasonable doubt.

To the extent that *People* v. *Ruthford* (1975) 14 Cal.3d 399, 408-409 [121 Cal.Rptr. 261, 534 P.2d 1341] and its progeny are to the effect that harmless-error analysis under *Chapman* is implicated, they should no longer be followed. When it was decided, *Ruthford* was

■ In addition, under Penal Code section 1473, a prisoner may seek relief in habeas corpus on, among other grounds, that "[f]alse evidence that is substantially material or probative on the issue of guilt or punishment was introduced against [him] at any hearing or trial relating to his incarceration . . . ." (Pen. Code, § 1473, subd. (b)(1).)

False evidence is "substantially material or probative" if it is "of such significance that it may have affected the outcome," in the sense that *"with reasonable probability* it *could have* affected the outcome . . . ." (*In re Wright* (1978) 78 Cal.App.3d 788, 814 [144 Cal.Rptr. 535], italics added (per Kaufman, J.).) In other words, false evidence passes the indicated threshold if there is a "reasonable probability" that, had it not been introduced, the result would have been different. (*Ibid.*) The requisite "reasonable probability," we believe, is such as undermines the reviewing court's confidence in the outcome. (Cf. *United States* v. *Bagley, supra,* 473 U.S. at p. 678 [87 L.Ed.2d at pp. 490-491] [dealing with prosecutorial nondisclosure of evidence in violation of the Fourteenth Amendment's due process clause].) It is dependent on the totality of the relevant circumstances. (*In re Wright, supra,* 78 Cal.App.3d at p. 817.) It is also, we believe, determined objectively. (Cf. *Strickland* v. *Washington, supra,* 466 U.S. at p. 695 [80 L.Ed.2d at p. 698] [dealing with ineffective assistance of counsel in violation of the Sixth Amendment].)

Thus, to merit relief on this basis, the prisoner must show that any false evidence introduced against him was substantially material or probative, as defined above. (See Pen. Code, § 1473, subd. (b)(1); see also *In re Wright, supra,* 78 Cal.App.3d at pp. 807-821 [construing and applying Pen. Code, § 1473, subd. (b)(1)].)

■ Like the substantive law, the procedural law that is applicable here may be concisely presented.

In a proceeding in habeas corpus, the petitioner bears the "burden . . . of alleging . . . the facts on which he relies in support of his claim [or claims] for relief . . . ." (*In re Lawler* (1979) 23 Cal.3d 190, 195 [151 Cal.Rptr. 833, 588 P.2d 1257].) He also "bears the burden of proving [those] facts . . . by a preponderance of the evidence." (*People* v. *Ledesma* (1987) 43

consistent with settled law. By the time of *Bagley,* however, the law had changed. Although some of our decisions may contain ambiguous language, they are substantially sound, and should be read in conformity with *Bagley.* (See, e.g., *In re Williams* (1994) 7 Cal.4th 572, 611 [29 Cal.Rptr.2d 64, 870 P.2d 1072] [following *Bagley,* but still speaking in terms of "error" and "prejudice"]; *People* v. *Gonzalez, supra,* 51 Cal.3d at p. 1242 [apparently following *Bagley,* but still speaking as though harmless-error analysis under *Chapman* were implicated].)

Cal.3d 171, 243 [233 Cal.Rptr. 404, 729 P.2d 839] (conc. opn. of Grodin, J.).)

In issuing an order to show cause in such a proceeding, a court makes "an implicit preliminary determination" as to claims *within the order* that the petitioner has carried his burden of allegation, that is, that he "has made a sufficient prima facie statement of specific facts which, if established, entitle him to . . . relief . . . ." (*In re Hochberg* (1970) 2 Cal.3d 870, 875, fn. 4 [87 Cal.Rptr. 681, 471 P.2d 1].) That determination, it must be emphasized, is truly "preliminary": it is only initial and tentative, and not final and binding. In issuing the order to show cause, the court also makes "an implicit determination" as to claims *outside the order* that the petitioner has failed to carry his burden of allegation, that is, that he has "failed to make a prima facie case . . . ." (*People* v. *Miranda* (1987) 44 Cal.3d 57, 119, fn. 37 [241 Cal.Rptr. 594, 744 P.2d 1127].) That determination is not preliminary. It may, of course, be changed. But unless changed, it stands.

### III

■ On review, our question is, was the Court of Appeal correct in denying the petition for writ of habeas corpus? For the reasons that follow, our answer is, yes.

In issuing our order to show cause, we had preliminarily determined that petitioner had carried his burden of allegation as to two claims and two claims alone. The first was the introduction at trial of false evidence that was substantially material or probative *on punishment*—specifically, the national-origin special-circumstance finding and the dependent sentence of life imprisonment without possibility of parole—viz., Busch's testimony. The second was the nondisclosure by the prosecution of evidence that was favorable to him and material *on that issue*, viz., evidence impeaching Busch, including benefits and/or promises of benefits from the authorities in exchange for his testimony.

In part we adhere to this preliminary determination, but in part we do not. We are now of the opinion that petitioner has failed to carry his burden of allegation as to *any* claim.

Specifically, we believe that petitioner has failed to carry his burden of alleging that the introduction at trial of false evidence that was substantially material or probative on the national-origin special-circumstance finding. He stumbles on *substantial materiality or probativeness*.

Considered in itself, Busch's testimony is hard to assign a weight. To be sure, it related petitioner's "confession," which provided the only direct

evidence that he intentionally killed Arikan because he was Turkish. Without question, a confession can "operate[] as a kind of evidentiary bombshell which shatters the defense." (*People* v. *Schader* (1965) 62 Cal.2d 716, 731 [44 Cal.Rptr. 193, 401 P.2d 665], overruled on another ground, *People* v. *Cahill* (1993) 5 Cal.4th 478, 509-510, fn. 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037]; accord, *Arizona* v. *Fulminante* (1991) 499 U.S. 279, 296 [113 L.Ed.2d 302, 322, 111 S.Ct. 1246] (opn. of White, J., for the court); *id.* at p. 313 [113 L.Ed.2d at pp. 333-334] (conc. opn. of Kennedy, J.).) It is undoubtedly in recognition of this fact that Busch was characterized as a "very strong" and "significant" witness by the trial court. Nevertheless, whatever effect his testimony might have had depends on whether the jury found it believable. Whether it did is open to question.[8] Certainly, Busch was extensively impeached. (See, *ante*, at p. 540.) As a consequence, the "testimonial thread" that he plied became severely "tattered." (*People* v. *Sassounian*, *supra*, 182 Cal.App.3d 361, 423 (conc. & dis. opn. of Johnson, J.).)[9]

Separate and apart from Busch's testimony, however, there was overwhelming evidence relating to the crime of first degree murder. Together with another gunman, petitioner intentionally killed Arikan, and did so with premeditation and deliberation. (See, *ante*, at pp. 538-539.) In a word, "there was nothing 'close' about this" issue. (*People* v. *Sassounian*, *supra*, 182 Cal.App.3d at p. 397.)[10]

---

[8]The *Sassounian* court asserted that the jury "clearly accepted" (*People* v. *Sassounian*, *supra*, 182 Cal.App.3d at p. 386, fn. 21) and "obviously believed" (*id.* at p. 395) Busch's testimony, and also implied as much (see *id.* at p. 409). It did so, however, without basis.

[9]It might perhaps be argued that Busch's testimony was improperly "corroborated" by information some jurors received concerning a telephone call to the Turkish consulate. That information might have "corroborated" that Arikan was the victim of assassination. But that is of no consequence. As stated, there was no substantial dispute that Arikan was the victim of assassination. The information, however, did not bear on whether petitioner participated in the assassination and, if so, what his motive might have been. To judge from the voir dire that the trial court conducted into the matter, the information, *as it was actually received and understood by the jurors in question*, did not connect the telephone call *to petitioner*. Any "apparent relevance" that the information might be asserted to have (*People* v. *Sassounian*, *supra*, 182 Cal.App.3d at p. 422 (conc. & dis. opn. of Johnson, J.)) simply does not appear.

[10]Petitioner argues to the contrary, but unpersuasively.

For example, the fact that the prosecutor, in the course of her summation, characterized Busch's testimony as "devastating" does not entail a conclusion that, with or without that testimony, the case was close as to first degree murder. The prosecutor also urged that, in light of the other evidence, Busch's testimony was not "essential," and in fact, was "just frosting on the cake." That the trial court disagreed does not prove the prosecutor wrong.

Also, the fact that the jury had need to make determinations concerning the credibility of witnesses does not entail a conclusion that, with or without Busch's testimony, the case was close as to first degree murder. This is true of almost all trials, no matter what the balance of inculpatory and exculpatory evidence. It does not distinguish the trial in question.

In addition, the fact that the jury devoted a great amount of time to deliberations and made several requests for rereading of testimony and clarification of instructions does not entail a

Even without Busch's testimony, this overwhelming evidence supports only one reasonable inference as to the national-origin special circumstance. Petitioner intentionally killed Arikan because he was Turkish.[11] Specifically, this evidence shows that he must have had a motive: his act was hardly "spontaneous." It also shows that his motive must have been anti-Turkish: his purpose evidently sprang from his "bad feelings towards the Turkish people for the things that they had done [to Armenians] in the past" and his view that "Turks are animals." It does *not* show any other possible motive, such as personal animus, kidnapping, or theft.[12]

---

conclusion that, with or without Busch's testimony, the case was close as to first degree murder. It may be explained, most reasonably, by reference to the extensiveness of the evidence and the complexity of the law; to the manifest significance of the determinations that the jury was called on to make; to the sympathy that many, if not all, of the jurors apparently had for petitioner as a young man; to an aiding-and-abetting instruction that was inapplicable on the facts but "may well have caused some confusion" (*People* v. *Sassounian, supra*, 182 Cal.App.3d at p. 403); and to the difficulty one juror evidently had in understanding the instructions. That the jury expended so much time and effort in its deliberations strongly suggests that Busch's testimony did not in fact "operate[] as a kind of evidentiary bombshell which shatter[ed] the defense." (*People* v. *Schader, supra*, 62 Cal.2d at p. 731.) Indeed, during the trial court's voir dire into the receipt by some jurors of information concerning a telephone call to the Turkish consulate, the juror who evidently had difficulty understanding the instructions made plain, albeit in testimony that was apparently inadmissible because it "concern[ed]" her "mental processes" (Evid. Code, § 1150, subd. (a)), that she at least had essentially discounted the value of Busch's testimony to zero.

Furthermore, the fact that some jurors received information concerning a telephone call to the Turkish consulate does not entail a conclusion that, with or without Busch's testimony, the case was close *as to first degree murder*. As understood, that information bore—or at least bore more heavily—on the national-origin special circumstance. (See fn. 9, *ante*.)

Lastly, the fact that the jury was unable to reach agreement on allegations of a lying-in-wait special circumstance and personal use of a firearm does not entail a conclusion that, with or without Busch's testimony, the case was close *as to first degree murder*. The jury hung at 11-1 in favor of true findings. Not surprisingly, the juror who held out on each was the juror who evidently had difficulty understanding the instructions.

[11]Perhaps more accurately, because Arikan was Turkish *and represented Turkey*. Such a characterization would not affect the national-origin special-circumstance finding. What is required is that which is here disclosed, i.e., an intentional killing "because of" the victim's "nationality or country of origin." (Pen. Code, § 190.2, subd. (a)(16).) There is no require-ment of an intentional killing "*solely* because of" the victim's "nationality or country of origin."

[12]Again, petitioner argues to the contrary, but unpersuasively. He asserts that, without Busch's testimony, the evidence supporting the national-origin special-circumstance finding was close if not insufficient. In this, he apparently follows the assessment offered by the *Sassounian* court. (See, e.g., *People* v. *Sassounian, supra*, 182 Cal.App.3d at pp. 374, 394, 402, 408; *id.* at pp. 417, 423, 426-430 (conc. & dis. opn. of Johnson, J.).) He focuses too narrowly on a single item of evidence apparently because it is "direct." At the same time, he overlooks the other evidence apparently because it is "circumstantial." Specifically, unlike the *Sassounian* court's concurring and dissenting justice, we do not find an indication that the evidence supporting the national-origin special-circumstance finding was "extremely close," in any relevant sense, in the fact that during the penalty phase the juror who evidently had difficulty understanding the instructions asked to change her vote on the finding. (*People* v.

In view of the foregoing, we conclude that it is not reasonably probable that petitioner could have obtained a different result in the absence of Busch's testimony. As a result, our confidence in the outcome is not undermined.[13]

We also believe that petitioner has failed to carry his burden of alleging the nondisclosure by the prosecution of evidence that was favorable to him and material on the national-origin special-circumstance finding. He stumbles on *materiality*. Our conclusion here is compelled by our conclusion above. Because it is not reasonably probable that he could have obtained a different result in the absence of Busch's testimony in its entirety, it is not reasonably probable that he could have obtained a different result in the absence of evidence that would merely have subjected Busch himself to impeachment—or better, *further* impeachment (see, *ante*, pp. 540-541). For the most that such evidence could have done would have been to render Busch's testimony a nullity. As a result, our confidence in the outcome is not undermined.[14]

In concluding that petitioner has failed to carry his burden of allegation, we necessarily conclude that he has failed to carry his burden of proof. Consequently, we need not, and do not, pass on the soundness of the reasoning that the Court of Appeal employed to arrive at the same result,

---

*Sassounian*, *supra*, 182 Cal.App.3d at p. 423 (conc. & dis. opn. of Johnson, J.).) To judge from the record, that juror was simply manifesting what may be called "convicter's remorse" —which must have been especially sharp as she faced the choice between death and life imprisonment without possibility of parole for a young man for whom she apparently had sympathy.

[13]In his arguments, petitioner proceeds as though Penal Code section 1473 does not require "[f]alse evidence" (Pen. Code, § 1473, subd. (b)(1)) to be "of such significance that it may have affected the outcome," in the sense that "*with reasonable probability* it *could have* affected the outcome" (*In re Wright*, *supra*, 78 Cal.App.3d at p. 814, italics added). It does. To the extent that he attempts to show the requisite "reasonable probability" of a different result in the absence of Busch's testimony other than objectively and under the totality of the relevant circumstances—as by assessing that testimony in isolation or in the abstract with a view toward what may be called the "idiosyncracies" of his particular jury and its deliberations (*Strickland* v. *Washington*, *supra*, 466 U.S. at p. 695 [80 L.Ed.2d at p. 698])—he may not do so.

[14]In his arguments, petitioner proceeds as though the Fourteenth Amendment's due process clause does not require any evidence not disclosed by the prosecution to be "material" in the sense that "there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different" (*United States* v. *Bagley*, *supra*, 473 U.S. at p. 682 [87 L.Ed.2d at p. 494] (lead opn. by Blackmun, J.); accord, *id.* at p. 685 [87 L.Ed.2d at p. 496] (conc. opn. of White, J.))—a "reasonable probability" being a probability sufficient to "undermine[] confidence in the outcome" (*id.* at p. 678 [87 L.Ed.2d at pp. 490-491]; accord, *id.* at p. 682 [87 L.Ed.2d at p. 494] (lead opn. by Blackmun, J.); see *id.* at p. 685 [87 L.Ed.2d at p. 496] (conc. opn. of White, J.)). It does.

including its determination that the referee's finding on the credibility of Busch's testimony was supported by substantial evidence.[15]

## IV

For the reasons stated above, we conclude that the judgment of the Court of Appeal must be affirmed.

It is so ordered.

Lucas, C. J., Kennard, J., George, J., Werdegar, J., Woods (A. M.), J.,* and Ramirez, J.,† concurred.

---

[15]In his attack on the Court of Appeal's decision, petitioner attempts to argue claims outside our order to show cause, including the prosecution's knowing use of perjured testimony bearing on punishment in violation of the Fourteenth Amendment's due process clause and also various points predicated on various legal bases seeking relief as to guilt as well as punishment. He may not do so. Confined by our order to show cause, the Court of Appeal's decision does not embrace those claims. Hence, it may not be assailed on those grounds. To the extent that petitioner may be understood, as it were, to request us to expand our order to show cause retroactively, we decline to do so. We note in passing that our order to show cause covered prosecutorial nondisclosure in violation of the Fourteenth Amendment's due process clause and not the California Constitution's analogous provisions, sections 7 and 15 of article I. We believe that petitioner would have been no more successful under the latter than under the former.

In his defense of the Court of Appeal's decision, the Director of Corrections argues that the petition for writ of habeas corpus filed in this court was unreasonably delayed. His argument is itself unreasonably delayed, inasmuch as it was made for the first time after we granted review. More important, it is unpersuasive, since petitioner has proceeded without delay, unreasonable or otherwise.

*Presiding Justice, Court of Appeal, Second Appellate District, Division Four, assigned by the Chairperson of the Judicial Council.

†Presiding Justice, Court of Appeal, Fourth Appellate District, Division Two, assigned by the Acting Chairperson of the Judicial Council.