KLEINFELD, Senior Circuit Judge,
concurring in part and dissenting in part:
Phillips murdered Bruce Bartulis at a vacant lot in 1977. He did his best to also murder Bartulis’s companion, Robert Rose. He shot Rose five times with a .45, poured gasoline on him, set him on fire with matches he had borrowed from Rose himself when they had stopped at a gas station (even though Phillips was a nonsmoker), and ran him over with a car. Phillips had told Bartulis and Rose, falsely, that he was going to make them a lot of money if they gave him $25,000 to buy *1198 cocaine for sale, and then told them he was going to sell them a lot of stolen insulation (they were builders). He did not have $25,000 worth of cocaine and did not have the stolen insulation. He told them to bring with them all the money they could get together, and to follow him to the deserted location he picked. After he shot them both, he took their wallets, picked up the brass from his cartridges, and went on the lam under a false name.
Rose amazingly survived the five bullets Phillips shot into his head, stomach, and arm, survived being set on fire, and survived being run over. He was the star witness against Phillips at trial, testifying to the events of the murder and attempted murder, and to the dealings leading up to them. Phillips’s then-girlfriend, Sharon Colman, who was present at the crime scene, testified to what Phillips had told her and what she had seen. The jury heard a tape recording of a phone call Phillips made to his childhood friend Richard Graybill, in which he bragged about how his “.45 sure did put a big hole right through him,” referring to one of his victims. Phillips’s mother testified to the time of his arrival home the night of the murder, which impeached Phillips’s perjured alibi testimony. Before trial, Phillips had gone so far as to put out contracts to kill old friend Graybill, former girlfriend Colman, survivor Rose, and even Phillips’s own mother, but they also failed to die on his schedule. The jury viewed as evidence the letter Phillips wrote to the hit man, providing descriptions, habits, and residences for his intended victims.
Phillips insisted on testifying at trial, claiming he was not even there when the murder occurred, having been at a “business meeting” elsewhere at the time. He has since admitted this testimony was a lie, and that he was in fact at the scene of the crime. But Phillips insisted on the alibi at trial. Phillips’s counsel argued that Graybill must have been the murderer. He showed there was a high likelihood that Colman and Graybill were getting freedom or lenience in exchange for testimony satisfactory to the prosecution, so they had good reason to testify favorably for the prosecution, truthfully or not. He even managed to come up with an argument for why Rose, the victim, might be lying.
Phillips’s counsel also explained to the jury that even if Phillips had committed the murder and attempted murder, the jury should not find the “special circumstance” to be true.[1] The special circum *1199 stance in this case was that “the murder [of Bartulis] was committed while [Phillips] was engaged in the commission or attempted commission of a robbery.”[2] Phillips’s counsel skillfully wove his special circumstance argument into the alibi theory, a challenging task. He gave a reason why Phillips had an interest in keeping Bartulis and Rose alive, that it would not make sense to kill the goose who was about to lay the $25,000 egg. It is hard to argue persuasively to a jury that “my client wasn’t even there and didn’t do it, but if he did, his purpose wasn’t robbery,” but counsel figured out a way to keep the special circumstance issue in the case as a potential barrier to the death penalty.
Now the majority vacates the jury’s special circumstance finding, speculating that if only the jury had been able to find out more about the inducements to Colman, the girlfriend, to say what the prosecutor wanted, the jury might have concluded that the murder was motivated by purposes other than robbery. The majority speculates that Phillips might have shot Bartulis and Rose to cover up Phillips’s prior dealings with them, or to prevent them from double-crossing him, or to retain the payments Bartulis and Rose had already made to him. These theories were unsupported by any evidence at trial. Even if the jury had decided Colman was not worthy of belief (it may well have, because she was effectively impeached and her motivation to testify was brought painstakingly before the jury), Colman’s alleged perjured testimony could not have affected the verdict. The evidence of an intent to rob by killing came from facts not dependent on anything Phillips’s girlfriend said.
The purpose of robbery was proved by overwhelming evidence. Rose testified that Phillips instructed him to come up with as much cash as he could get, that Phillips lured the men to a deserted location, shot them, then took their wallets. The jury also learned of Phillips’s motive to rob. He lived in a $600,000 Newport Beach beachfront house ($600,000 in 1977 dollars), drove an expensive sports car, flew about in private planes, and dated a beautiful young woman, despite having no money and needing to borrow $125 from his mother the day after the murder. If the jury had the slightest doubt that Phillips would murder in cold blood just to get some cash, their doubts would have been allayed by the proof that he put out a “contract” on his girlfriend, his old friend, his surviving victim, and even his own mother.
The majority concludes that none of the prosecutorial misconduct could have made any difference to whether the jury would have found Phillips guilty of attempted murder, first-degree murder, and robbery, and that defense counsel was not constitutionally ineffective. I concur in those conclusions. I also concur in the characterization of prosecutorial misconduct. I do not concur in the attacks on defense counsel’s assistance. The reasons appear more fully *1200 in my previous dissent, found at, Phillips v. Woodford, 267 F.3d 966, 988 (9th Cir.2001) (Kleinfeld, J., dissenting). Defense counsel appears from the record to be a very fine lawyer who did an excellent job for Phillips. The majority now concedes that under Cullen v. Pinholster[3] defense counsel was not constitutionally ineffective, overruling its holding to the contrary in Phillips v. Woodford[4] I dissent from the portion of the majority’s opinion vacating the jury’s special circumstance finding that the murder of Bartulis was “committed during the commission or attempted commission of a robbery.”
Phillips was sentenced to death in 1980. Since then he has evaded his sentence by means of more than three decades of additional litigation. And now he succeeds again, on the meritless claim adopted by the majority that had the jury been aware of additional impeachment evidence as to the girlfriend’s motivation for testifying, it might have reasonably concluded that the robbery was merely incidental to the murder.
The majority appropriately labels the prosecutor’s tactics in this case as deplorable, but as the United States Supreme Court has expressly directed:
We do not [] automatically require a new trial whenever a combing of the prosecutors’ files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.... A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury.[5]
Thus, it is not enough to find constitutional error. Instead, the court is required to consider all of the evidence and determine whether the false evidence was material to the jury’s judgment.[6]
The “any reasonable likelihood” of an effect on the jury standard applies to direct appeals. This is not a direct appeal. This is a habeas proceeding, best characterized as a second or successive habeas proceeding. Probably the correct standard is that a federal court cannot grant relief unless the evidence is “clear and convincing” that, had the Colman deal been disclosed to defense counsel and the jury, “no reasonable juror would have found him eligible for the death penalty.”[7] Like the petitioner in Calderon v. Thompson, Phillips’s false alibi was “devastating to his defense,”[8] under any standard.
*1201 Because this is a habeas proceeding, we are constrained not only by the requirement of prejudice, but also by the requirement of deference to the state courts. Phillips was convicted and sentenced in state court. On direct appeal, the California Supreme Court carefully weighed the prejudicial effect of the prosecutor’s wrongful nondisclosure of the deal between the prosecutor and the girlfriend’s lawyer. The Court found, and the transcript fully supports its finding, that “the jury was made well aware of the possible impact of Colman’s expectation of leniency on her credibility.”[9] The California Supreme Court further noted, after thorough discussion of the evidence, that “the key witness against defendant was Ronald Rose,” his testimony was well-corroborated, the evidence against Phillips was “overwhelming,” and the jury’s verdict “a foregone conclusion”:[10]
While the defense should have been given a fuller opportunity to discover evidence that might have permitted a stronger attack on Colman’s credibility, closing arguments on both sides demonstrate that the jury was made well aware of the possible impact of Colman’s expectation of leniency on her credibility. The prosecutor noted that “it wouldn’t make any sense if she came in here and testified unless she were hoping for consideration ... that’s why she’s testifying.” Defense counsel emphatically brought home to the jury the potentially coercive effect of the prosecution’s tactics, declaring that “they’re holding a murder charge over her head to testify, and she’s singing like a bird, the tune that they call.” In this situation, the jury could properly assess Col-man’s credibility even without testimony on a specific agreement between her attorney and the prosecution.
Furthermore, the evidence against defendant with respect to the charged offense was overwhelming. While Colman was an important prosecution witness, the key witness against defendant was Ronald Rose, the victim who miraculously survived despite being shot, set on fire and run over by a car. Given Rose’s testimony, and the considerable amount of corroborating evidence, the jury verdict as to guilt and the special circumstance allegation was virtually a foregone conclusion. Under the circumstances, there was no prejudice to the defendant.[11]
In addition, the Superior Court of California, County of Madera, in its order denying Phillips’s writ of habeas corpus, made factual findings and concluded, “Clearly [Colman’s] credibility because of a ‘deal,’ and a pending murder charge was put before the jury, and, as stated by the Supreme Court, the jury had sufficient facts with which to evaluate Sharon Col-man’s testimony.” The federal district court also concluded in a thorough sixty-one page order denying Phillips’s federal habeas petition that any constitutional errors at trial could not have reasonably affected the judgment of the jury, because of the overwhelming evidence against Phillips other than Colman’s testimony.
The majority rejects the conclusion of every other court to have addressed this case. “This readiness to attribute error is inconsistent with the presumption that state courts know and follow the law.”[12] *1202 Even assuming “any reasonable likelihood” of an effect on the jury is the correct standard, this Court is still required to presume the correctness of state court factual findings,[13] and to review the findings of the district court for clear error.[14] The majority disregards these standards, and instead takes upon itself the role of a jury of two, in an imaginary trial that never occurred.
I need not base my dissent on the precise standard applicable to the constitutional error, limitations of our habeas authority, or our duty of deference to state court findings and the presumption of their correctness. The question of how, precisely, to formulate the standard is quite complex. Should Phillips have been permitted to raise his new argument at all, after his many past proceedings? Should the petition raising the new argument be treated as pre-AEDPA or post-AEDPA?[15] To what extent may the state findings be viewed as mixed questions of fact and law? Did we have authority to direct the district court to take new evidence, evidence not before the state courts? Do we have authority to grant a petition based on evidence so obtained? Should the proper standard for us be whether Phillips has offered “clear and convincing” evidence that “no reasonable juror” would have found him to be subject to the robbery special circumstance, had the jury known of the prosecutor’s deal with the girlfriend’s lawyer? These complex questions need not be answered because no matter what, precisely, our proper standard and our deference obligation to the state courts may be, the result would be the same. Even were we reviewing directly, as though we were a state supreme court, we would have to reach the same conclusion as the California Supreme Court reached in this case.
I assume for purposes of discussion that the standard most favorable to Phillips applies. That standard is whether there is any reasonable likelihood that the arguably false testimony Colman gave “could have” affected the judgment of the jury on the special circumstance finding. The majority concedes that “[i]t is unimaginable” that the jury could have reached a different verdict on the first-degree murder charge, despite the prosecutor’s wrongdoing. Likewise “[i]t is unimaginable” that the jury could have reached a different conclusion as to the special circumstance of the murder occurring “during the commission of a robbery.” Had the jury been fully informed of the prosecutor’s agreement with Colman’s lawyer, and that she had escaped prosecution on unrelated charges, it would have made no difference to the verdict. The jury was well-informed of the reasons for skepticism about her testimony. Colman candidly admitted at trial that she expected the prosecution to take her willingness to cooperate into consideration. The prosecutor admitted during his closing argument that Colman was an accomplice who expected leniency, *1203 and her testimony should be viewed with distrust:
She also testified that she was hoping for consideration, and that is only understandable; as a matter of fact, it wouldn’t make any sense if she came in and testified unless she were hoping for consideration. Naturally, she’s hoping for consideration. Naturally, she’s hoping for leniency. And it only seems reasonable that she would hope and anticipate that she would be treated leniently, and, of course, that’s why she’s testifying. And, of course, that’s why her attorney told her to cooperate and to testify. But it doesn’t mean she’s lying. ... Under the law it is true that Miss Colman is what’s called an accomplice____ That means that you really stand back and you look at it and you decide, now, is this girl really telling the truth.... You have to have what’s called corroboration; in other words, the Defendant could never be convicted on the testimony of Miss Colman alone.
The judge then instructed the jury that Colman was an accomplice and that her testimony should be viewed with distrust:
... Sharon Colman was an accomplice .... The testimony of an. accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case.
The jury did not need Colman’s testimony, that Phillips was disappointed in how little money he got, to conclude that the murders were committed “during the commission of a robbery.” Indeed, she did not even say that robbery was Phillips’s purpose. Phillips probably lost his own case by lying to the jury, and Rose certainly established the state’s case with his powerful and highly credible testimony. Colman was not the critical witness for the robbery special circumstance finding. Rose was.
Rose, the miraculously surviving victim, testified that Phillips “told me to get as much cash together as I could and what time to meet him and where to meet him in Fresno; that was early in the morning on the 7th.” That night, Phillips led Rose to a remote location and shot him five times. Rose testified that he then felt “someone moving me around such as searching my pockets” and that he heard “a male voice” next to him while his pockets were being searched. Although Phillips took Rose’s wallet, which was in his rear pocket, Phillips never found the “thirty-five hundred to five thousand dollars in cash” in Rose’s “upper coat pocket.” Phillips then poured gasoline on Rose, set him ablaze, and ran him over with his mother’s car after Rose began running around the dark, empty parking lot to which Phillips had led him, trying to shed his burning clothes. The majority speculates that Phillips’s purpose may not have been to take Rose’s and Bartulis’s money, because he did a poor job of searching them and missed the wad of cash “the size of a cigarette pack” that Rose had in the breast pocket of his bloody jacket. Many criminals do slip-shod work, and many robbers are disappointed with the proceeds, but “I wouldn’t have robbed and killed him had I known that was all I would get,” or “I wish I’d searched his other pockets,” is not the same as “I did not kill him as part of my robbery.”
California law defines robbery as “the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.”[16] Taking a man’s money by killing *1204 him fits the definition whether the robbery victim is dead or alive when the killer takes his wallet.[17] If the jury believed Rose, as it plainly did, the only reasonable inference was that Phillips shot and robbed him and Bartulis for their money.
Scratching around for some authority, the majority relies on the distinction drawn in People v. Green,[18] between murders occurring during the commission of a robbery and murders where the robbery was incidental to the murder. The distinction is correct, but the majority errs in applying that distinction to Phillips’s crimes. In Green, the defendant shot his wife in the face with a sawed-off shotgun, killing her, because he thought she was “fooling around” and was going to leave him.[19] He had made her take off her clothes, and he removed the wedding rings from her corpse, took her purse, and got rid of the shotgun.[20] The Court held that he had killed his wife on account of jealousy or as revenge for “snitching,” without any purpose of stealing from her, and that he took the clothes, rings, and purse to leave her unidentifiable, not to steal her property.[21] The Court held that the special circumstance did not apply because taking the clothes, rings, and purse “was not in fact a murder in the commission of a robbery but the exact opposite, a robbery in the commission of a murder.”[22] The robbery aggravator, the Court held, was not a mere matter of chronology, but a legislative choice to increase the punishment available for criminals “who killed in cold blood to advance an independent felonious purpose.”[23] The Court’s phrasing of the distinction squarely puts Phillips on the wrong side, because he killed Bartulis in cold blood in order to steal his money.
The majority cites two other California cases on this issue, People v. Abilez,[24] and People v. Morris.[25] In Abilez, the defendant raped his 68-year-old mother anally, strangled her, and took items of value from her house.[26] He hated his mother because she gave him up to his aunt to be raised, even though his mother raised her other nine children.[27] Applying the Green distinction, Abilez upheld the robbery special circumstance finding. The Court distinguished Green because Abilez had made remarks about needing money, his mother would not lend him her car or give him money when he asked for it, she accused him of stealing from her, and he took the car, stereo, and other items from the house after killing her.[28] From these facts, the *1205 Court held, the jury could reasonably infer a concurrent intent to kill, rob, and sodomize.[29]
In Morris, the defendant was a prostitute who solicited gay men and killed one of his customers. He said the reason he killed his customer was that “he had to kill one.”[30] The special circumstance was held not to apply because there was insufficient evidence that the defendant had taken anything from the customer when he killed him.[31] There was no robbery, so there was no special circumstance of murdering during the commission of a robbery.
The majority misses the point in People v. Marshall,[32] a highly relevant California Supreme Court decision applying and expanding upon Green. Marshall had raped and murdered a woman, and took a letter from her. The letter was from a grocery store responding to the victim’s request for a “check-cashing card,” and was of no interest to the murderer. He took the letter as a souvenir of the crime.[33] The reason that the special circumstance did not apply was that there was no evidence that he killed the woman “for the purpose of obtaining the letter.”[34] Contrasting Morris’s case with one where the special circumstance would apply, the Court explained the Green distinction with a hypothetical case in which, under Green, the special circumstance would be appropriate. And the hypothetical is the Phillips case, a murderer who takes the victim’s wallet:
If a person commits a murder, and after doing so takes the victim’s wallet, the jury may reasonably infer that the murder was committed for the purpose of obtaining the wallet, because murders are commonly committed to obtain money. In this case, however, the letter taken by defendant was, in the prosecutor’s words, an “insignificant piece of paper.”[35]
Here, the jury concluded that Phillips committed murder for the purpose of obtaining Rose’s and Bartulis’s money. Phillips took their wallets, which is where men typically carry their money. Unlike the murderer in Marshall, he did not take a worthless memento. The majority comes up with some notions of why Phillips may have shot and robbed Rose and Bartulis for some reason other than to take their money, even though he needed and took the $150 in their wallets. But as the Supreme Court of California has stated, “we need not discern the[ ] various mental states in too fine a fashion; a concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance.”[36] The evidence in this case overwhelmingly supported the conclusion that Phillips possessed the intent to rob these men. He needed the money, he told them to bring it, he shot them, and he took it. The majority’s suggestion that had the jury been fully informed of Colman’s inducements, it maybe would have concluded otherwise, “is an insult to the jury.”[37]
*1206 The majority’s willingness to disrupt the well-founded decision of the California Supreme Court also disturbs “the State’s interest in the finality of convictions that have survived direct review within the state court system.”[38] As the United States Supreme Court has stated in overturning similar decisions:
Finality also enhances the quality of judging. There is perhaps ‘nothing more subversive of a judge’s sense of responsibility, of the inner subjective conscientiousness which is so essential a part of the difficult and subtle art of judging well, than an indiscriminate acceptance of the notion that all the shots will always be called by someone else.’[39]
Juries are too likely to impose the death penalty lightly if they reasonably infer, from decisions like this one, that it will almost never actually be carried out.
The question the majority addresses seems to be “is there any conceivable, speculative possibility we can think of that would make Phillips guilty but without the special circumstance?” Whatever the proper standard may be, that is not it. To determine whether the prosecutor’s wrongdoing was prejudicial, the most Phillips could demand would be whether there is “any reasonable likelihood that the false testimony could have affected the judgment of the jury.”[40] The only answer to the question is “no.”
The majority correctly concludes that “[i]t is unimaginable” that the prosecutor’s wrongful conduct could have affected the first-degree murder guilty verdict. It is likewise unimaginable that it could have affected the special circumstance finding. We should affirm.

. Cal.Penal Code § 190.2(a)(17)(A) (“The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found ... to be true ... The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit ... Robbery....”); Cal.Penal Code § 190.4(a) (“In case of reasonable doubt as to whether a special circumstance is true, the defendant is entitled to a finding that it is not true.”); see. also Pulley v. Harris, 465 U.S. 37, 51-53, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) (rejecting constitutional challenge to this sentencing scheme and explaining, “Under [California’s] scheme, a person convicted of first degree murder is sentenced to life imprisonment unless one or more 'special circumstances’ are found, in which case the punishment is either death or life imprisonment without parole. Special circumstances are alleged in the charging papers and tried with the issue of guilt at the initial phase of the trial. At the close of evidence, the jury decides guilt or innocence and determines whether the special circumstances alleged are present. Each special circumstance must be proved beyond a reasonable doubt. If the jury finds the defendant guilty of first degree murder and finds at least one special circumstance, the trial proceeds to a second phase to determine the appropriate penalty. Additional evidence may be offered and the jury is given a list of relevant factors. After having *1199 heard all the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole. If the jury returns a verdict of death, the defendant is deemed to move to modify the verdict. The trial judge then reviews the evidence and, in light of the statutory factors, makes an independent determination as to whether the weight of the evidence supports the jury's findings and verdicts. The judge is required to state on the record the reasons for his findings. If the trial judge denies the motion for modification, there is an automatic appeal.’' (citations, brackets, and quotations omitted)).

. California Jury Instruction — Criminal (“CALJIC”) No. 8.81.17; Cal.Penal Code § 190.2(a)(17)(A).

. Cullen v. Pinholster, - U.S. -, 131 S.Ct. 1388, 1406-07, 179 L.Ed.2d 557 (2011).

. Phillips v. Woodford, 267 F.3d 966, 980 (9th Cir.2001).

. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (citations and quotations omitted).

. See also Smith v. Cain, 565 U.S. -, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012) ("We have observed that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict.”).

. See Sawyer v. Whitley, 505 U.S. 333, 350, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992) (holding petitioner is required to "show by clear and convincing evidence that but for constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty”); Calderon v. Thompson, 523 U.S. 538, 560, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) ("To the extent a capital petitioner contests the special circumstances rendering him eligible for the death penalty, the Sawyer 'clear and convincing’ standard applies, irrespective of whether the special circumstances are elements of the offense of capital murder or, as here, mere sentencing enhancers.”).

. Calderon v. Thompson, 523 U.S. 538, 561, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998).

. People v. Phillips, 41 Cal.3d 29, 48, 222 Cal.Rptr. 127, 711 P.2d 423 (1985).

. Id. at 49, 222 Cal.Rptr. 127, 711 P.2d 423.

. Id. at 48-49, 222 Cal.Rptr. 127, 711 P.2d 423.

. Woodford v. Visciotti, 537 U.S. 19, 23, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam) (citing pre- and post-AEDPA authority, and reinstating capital sentence for California prisoner convicted of first-degree murder, attempted murder, and armed robbery).

. Sumner v. Mata, 455 U.S. 591, 591-92, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) ("28 U.S.C. § 2254(d) requires federal courts in habeas proceedings to accord a presumption of correctness to state-court findings of fact”); id. at 592-93, 102 S.Ct. 1303 ("the presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes the finding of fact”); id. at 595 n. 5, 102 S.Ct. 1303 (noting rule applies to state court findings of fact on direct appeal and in state habeas proceedings).

. Jackson v. Brown, 513 F.3d 1057, 1069 (9th Cir.2008) ("The district court's factual findings are reviewed for clear error. We therefore accept its findings absent a firm conviction that a mistake has been committed.” (internal quotations omitted)).

. See Phillips v. Woodford, 267 F.3d 966, 989 (9th Cir.2001) (Kleinfeld, J., dissenting) (noting Phillips filed his petition after the AEDPA went into effect).

. Cal.Penal Code § 211.

. People v. Navarette, 30 Cal.4th 458, 499, 133 Cal.Rptr.2d 89, 66 P.3d 1182 (2003) ("While it may be true that one cannot rob a person who is already dead when one first arrives on the scene, one can certainly rob a living person by killing that person and then taking his or her property.").

. People v. Green, 27 Cal.3d 1, 164 Cal.Rptr. 1, 609 P.2d 468 (1980).

. Id. at 13-14, 164 Cal.Rptr. 1, 609 P.2d 468.

. Id. at 15-16, 164 Cal.Rptr. 1, 609 P.2d 468.

. Id. at 56, 164 Cal.Rptr. 1, 609 P.2d 468.

. Id. at 60, 164 Cal.Rptr. 1, 609 P.2d 468.

. Id. at 61, 164 Cal.Rptr. 1, 609 P.2d 468.

. People v. Abilez, 41 Cal.4th 472, 61 Cal. Rptr.3d 526, 161 P.3d 58 (2007).

. People v. Morris, 46 Cal.3d 1, 249 Cal.Rptr. 119, 756 P.2d 843 (1988), overruled on other grounds by In re Sassounian, 9 Cal.4th 535, 543 n. 5, 37 Cal.Rptr.2d 446, 887 P.2d 527 (1995).

. People v. Abilez, 41 Cal.4th 472, 483-84, 61 Cal.Rptr.3d 526, 161 P.3d 58 (2007).

. Id.

. Id. at 511-12, 61 Cal.Rptr.3d 526, 161 P.3d 58.

. Id. at 512, 61 Cal.Rptr.3d 526, 161 P.3d 58.

. People v. Morris, 46 Cal.3d 1, 21, 249 Cal.Rptr. 119, 756 P.2d 843 (1988), overruled on other grounds by In re Sassounian, 9 Cal.4th 535, 543 n. 5, 37 Cal.Rptr.2d 446, 887 P.2d 527 (1995).

. Id. at 22, 249 Cal.Rptr. 119, 756 P.2d 843.

. People v. Marshall, 15 Cal.4th 1, 61 Cal.Rptr.2d 84, 931 P.2d 262 (1997).

. Id. at 12, 61 Cal.Rptr.2d 84, 931 P.2d 262.

. Id. at 34, 61 Cal.Rptr.2d 84, 931 P.2d 262.

. Id.

. People v. Abilez, 41 Cal.4th 472, 511-12, 61 Cal.Rptr.3d 526, 161 P.3d 58 (2007).

. Thompson v. Calderon, 120 F.3d 1045, 1073 (9th Cir.1997) (en banc) (Kleinfeld, J., dissenting), rev’d, Calderon v. Thompson, 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998).

. Calderon v. Thomas Thompson, 523 U.S. 538, 555, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998).

. Id. (quoting Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L.Rev. 441, 451 (1963)).

. United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).