Filed 3/11/13  P. v. Rogers CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C067770 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F07686) |
| v. | |
| CHRISTOPHER ROGERS, | |
| Defendant and Appellant. | |

After an initial jury deadlocked, a second jury, upon retrial, convicted defendant Christopher Rogers of first degree murder and found he personally discharged a firearm to commit the killing.  (Pen. Code, §§ 187, subd. (a), former 12022.53, subd. (d).)

Sentenced to an aggregate state prison term of 50 years to life, defendant appeals. He contends there is insufficient evidence (1) that he was the killer, and (2) that he deliberated and premeditated.  He also claims that (3) the prosecutor engaged in prejudicial misconduct during argument, and (4) he is entitled to 10 additional days of presentence custody credit for actual time served.  We agree with defendant about the

1

additional custody credit, but disagree on his three other contentions. Consequently, we shall modify the judgment to add the 10 days of credit, and affirm in all other respects.

## FACTUAL BACKGROUND

### *Discovery of the Body and Initial Investigation*

At about 8:25 a.m. on Thanksgiving Day, November 25, 2004, Sothat Lee's (Lee) cousin discovered a lifeless female body outside Lee's front door. Lee's cousin was visiting from San Diego and had arrived about six hours earlier; no body was there then.

Lee lived at the intersection of 43rd Avenue and 40th Street in Sacramento. That intersection dead-ended within a block in both street directions, because of Highway 99, which ran diagonally through the area. Next to Highway 99's sound wall in this area was a small triangular grassy field (sometimes referred to as an easement). On the opposite corner of the block from Lee's house was Pacific Elementary School, at the intersection of 44th Avenue and 41st Street.

The body was later identified as that of the victim, Juanita Johnson. Police officers followed a blood trail from Lee's house to the triangular grassy field, where the evidence—most prominently, a large amount of pooled blood, and the beginning of the trail—indicated the shooting had taken place. Just a few feet away, officers discovered a fresh condom still containing a white substance.

### *Johnson's Autopsy*

Johnson died from a single, not immediately fatal, gunshot wound to her face, which entered her right cheek, exited just below her left earlobe, and severed a major artery (the left maxillary). Gunpowder stippling found on Johnson's right cheek indicated she had been shot from a distance of one and a half to four feet. The forensic pathologist conducting the autopsy, who was not a ballistics expert, believed the bullet

2

fragments that were recovered from Johnson were from a small to medium caliber gun (.22-caliber to .38-caliber). Johnson's body did not exhibit any classic defensive wounds.

The pathologist took swabs from Johnson's oral, vaginal, and rectal cavities.

*Johnson's Activities Before the Murder*

Johnson, who occasionally worked as a prostitute, had a casual relationship with Bernard Holland, who called her "Joyce." Around 4:00 a.m. on Thanksgiving Day, November 25, 2004, Johnson left Holland's house to go on a "date" (prostitution), after the rock cocaine the two had been smoking with two others, ran out.

Johnson never returned to Holland's house; she was supposed to be back by 8:00 a.m., as the two of them planned to spend Thanksgiving with Johnson's family.

Holland provided the police his DNA sample as well as his .38-caliber revolver, neither of which linked him to Johnson's killing.

*Cold Case and DNA Evidence*

Johnson's case went cold, until July 2009, when DNA test results linked defendant to the matter.

The sperm in the condom recovered at the apparent shooting scene came from a single source matching defendant's DNA profile. The sperm recovered from Johnson's vagina matched defendant's DNA profile. And the sperm found in Johnson's rectum yielded a partial profile consistent with defendant's DNA profile.

Furthermore, the sperm concentration on the vaginal swab disclosed a "4-plus" concentration (the highest score possible). A 4-plus concentration was consistent with the victim being motionless and/or horizontal shortly after intercourse; one would generally expect the concentration to diminish if, following intercourse, the person remained upright, walked some distance, and engaged in normal physical activities for some period of time.

3

### *Defendant's Pretrial Statements*

The police interviewed defendant twice: first on August 7, 2009, and again on October 1, 2009.

In both interviews, defendant initially denied any familiarity with the apparent shooting scene, although evidence from his former girlfriend and from a clerk at the Pacific Elementary School disclosed that defendant had driven regularly by that scene over a period of years, when he ferried his children to that school from the fall of 2001 to the spring of 2005. The school was just one block from the apparent crime scene. Confronted with some of this evidence, defendant eventually conceded in the second interview that the crime scene did look a little familiar.

Defendant steadfastly maintained that he never owned a gun, never had a gun, never shot a gun, never possessed a gun, and never bought a gun, until overwhelming contrary evidence from his former girlfriend and from his own mother forced him to concede that he had possessed a gun (around the time of the murder), a "little .22," which "stayed under the mattress" and which he later sold to someone named "Buddy" (who could not be located). Evidence showed that when defendant's former girlfriend moved out of defendant's home toward the end of 2005, she discovered the gun under the mattress and gave it to defendant's mother; when defendant learned the gun was missing, he angrily and repeatedly called the former girlfriend demanding it.

Defendant denied recognizing Johnson, denied ever having sex with her, and denied ever hurting her. When confronted with the condom-DNA evidence, he acknowledged he may have had sex with Johnson.

Finally, defendant claimed that the time period around 4:00 to 6:00 in the morning were "not [his] hours" and that he had been faithful to his former girlfriend, but his former girlfriend and other evidence (including from defendant himself) contradicted these claims.

4

*Defendant's Interview with Sacramento Bee Reporter*

The day after his second police interview (October 2, 2009), defendant told a *Sacramento Bee* reporter that he and Johnson had had sex in the room of a friend of Johnson's, that they had shared a pint of Courvoisier (cognac), and that after their time together, he drove her to the store and then back to the friend's place; she got out of the car and walked off, looking perfectly fine. Defendant also denied owning or having a gun (coinciding with the time of the incident).

A blood sample taken during Johnson's autopsy disclosed no alcohol in her system, but did show cocaine and cocaine metabolite.

## DISCUSSION

### I. Sufficiency of the Evidence

Defendant contends the evidence is insufficient to establish that he was the murderer, and that he premeditated and deliberated. Discussing these two contentions in turn, we disagree.

In reviewing the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is reasonable, credible and of solid value—such that a rational trier of fact could have found the challenged elements of the crime beyond a reasonable doubt. (*People v. Davis* (2009) 46 Cal.4th 539, 606.) The evidence against defendant was circumstantial, but such evidence "may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." (*People v. Pierce* (1979) 24 Cal.3d 199, 210.)

### A. Sufficiency of the Evidence—Murderer

Having just delineated the evidence, it makes little sense to detail it all over again here.

5

Suffice it to say, the DNA and condom evidence strongly linked defendant to victim Johnson shortly before her death. This evidence encompassed the highest possible measurement of sperm concentration on the vaginal swab from Johnson, and also encompassed defendant as the single source of the DNA.

Defendant's fabrications to the police, especially those involving his unfamiliarity with Johnson, his unfamiliarity with the scene of the shooting, and his unfamiliarity with any firearm, were especially damning. His statements to the *Sacramento Bee* reporter of his familiarity with Johnson and his unfamiliarity with a gun, just a day after his second police interview, only added fuel to the fire of circumstances against him. And the post-shooting anger he leveled at his former girlfriend upon learning that his gun was missing, a gun that was consistent with the shooting, suggested a certain consciousness of guilt.

We conclude there is sufficient evidence that defendant was the murderer.

### B. *Sufficiency of the Evidence—Premeditation and Deliberation*

This sufficiency question is the tougher one, largely because there was no evidence as to *why* Johnson was killed.

" ' "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]" [Citation.] " 'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.)

What courts generally look for in terms of evidentiary sufficiency regarding this element is evidence of planning, of motive, and of a deliberate manner of killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) These factors are not exhaustive, and they are descriptive categories rather than normative rules. (*Ibid.*; *People v. Perez* (1992)

6

2 Cal.4th 1117, 1125.) For sufficiency purposes, evidence of all three, or at least strong evidence of planning or motive, in conjunction with manner, generally clears the sufficiency hurdle. (*People v. Thomas* (1992) 2 Cal.4th 489, 517; *People v. Alcala* (1984) 36 Cal.3d 604, 625-626.)

We can state flatly that there was no *evidence* of any motive presented here—again, no evidence as to *why* Johnson was killed.

The killing took place in a somewhat secluded area next to a freeway with a sound wall, in the darkness of an early morning on a heavily traveled holiday. Defendant knew this area well. The victim was a prostitute who had just plied her trade with defendant. Evidence showed that defendant armed himself with a loaded gun prior to taking Johnson to the secluded area. All of this suggests planning. (*People v. Elliot* (2005) 37 Cal.4th 453, 471 [" 'the total vulnerability of the victim and the evidence of a previously selected remote spot for the killing do suggest planning' "]; *People v. Morris* (1988) 46 Cal.3d 1, 23 ["Clearly, when one plans to engage in illicit activity [prostitution, in that case] at an isolated location during the early morning hours, and one brings along a deadly weapon which is subsequently employed, it is reasonable to infer that one 'considered the possibility of homicide from the outset' "], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543-544 & fn. 5.)

Furthermore, the evidence shows that defendant shot Johnson in the head from close range, from just a few feet away. Johnson did not exhibit any classic defensive wounds, and she and defendant had engaged in vaginal and anal sex shortly before the shooting. Most likely, defendant did not have the gun in his hand while having sex with Johnson (and, if he did, this is no better for him from a standpoint of premeditation and deliberation). This means that at some time after having sex, defendant reached for his loaded gun, pointed it at Johnson's head, and pulled the trigger. All of this points to a deliberate manner of killing—a cold, calculated decision to kill. (*People v. Marks* (2003)

7

31 Cal.4th 197, 230 [a close-range shooting to the head or face without provocation or evidence of struggle may show premeditation and deliberation]; *People v. Halvorsen* (2007) 42 Cal.4th 379, 422 [same]; *People v. Caro* (1988) 46 Cal.3d 1035, 1050 [same].)

We conclude that the evidence regarding planning and the manner of killing provides sufficient evidence of premeditation and deliberation to sustain the jury's finding.

## II. Prosecutorial Misconduct

Defendant contends the prosecutor committed misconduct in arguing to the jury that (1) the jury would be derelict in its duty if it failed to reach a verdict and that a hung jury would be as if the trial had not happened and would allow a murder to go unpunished; (2) the jury was required to solve the puzzle created by the evidence; (3) deliberation and premeditation were established as long as the evidence showed that sufficient time had elapsed for it to occur; and (4) the defense had to disprove aspects of the prosecution's case. We find no prejudicial error.

Preliminarily, we note that defendant has forfeited all four of these contentions by failing to object to any of this alleged misconduct and to request a curative admonition from the trial court. (*People v. Stanley* (2006) 39 Cal.4th 913, 952.) Nevertheless, we will consider briefly the merits of these contentions in the context of defendant's purported ineffective assistance claim. In so considering, we will proceed straight to the question of ineffective assistance prejudice: Is there a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that defendant would have fared better had defense counsel objected to these alleged instances of prosecutorial misconduct? (*In re Avena* (1996) 12 Cal.4th 694, 721; *People v. Cox* (1991) 53 Cal.3d 618, 656 [a court need not determine whether counsel's performance was deficient if a defendant fails to show prejudice].) As we shall explain, we do not think so.

First, the prosecutor's comments about the dereliction of duty, about a hung jury equating to no trial, and about a murder going unpunished, were made in the context of the prosecutor's admonishment to the jury to not let a failure to agree on first degree murder derail a verdict; a second degree verdict would suffice. Defendant likens these remarks to the prosecutor's discredited jury pressure tactics found in *People v. Pitts* (1990) 223 Cal.App.3d 606. In *Pitts*, the prosecutor told the jury that the defense needed only one vote to block a conviction, and that if the prosecution persuaded only 11 jurors, " '[i]t wipes out six months [of trial], folks. It's as though it never existed.' " (*Id.* at p. 695, some capitalization omitted.) The challenged comments and context here do not rise to the pressure level displayed in *Pitts*.

Second, defendant faults the prosecutor's theme that this circumstantial case was akin to a puzzle that could be solved by putting "all" the pieces together. This line of argument did not approach that of the argument we deemed misconduct in *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, upon which defendant relies. In *Katzenberger*, the prosecutor analogized the reasonable doubt standard to an eight-piece slide show puzzle of the Statue of Liberty, telling the jurors after the sixth piece was in place that the reasonable doubt standard was met. (*Id.* at pp. 1264, 1267.) The problem with the argument in *Katzenberger* was that by using such a well-known image in such a simple way—enabling some jurors to guess the image after only one or two pieces—the argument effectively told the jurors the reasonable doubt standard could be met in an obvious way with just a few pieces of evidence. (*Id.* at p. 1267.)

Third, defendant maintains the prosecutor improperly analogized the finding of premeditation and deliberation to the process of deciding whether to stop or go on a yellow traffic light, thereby misstating the law on this issue. But the prosecutor used the traffic light decisionmaking process simply as an *example* of how a cold, calculated

9

judgment could be formed in a *short period of time*. As the prosecutor correctly reminded the jury, it was "the extent of the reflection, not the time," that mattered.

Fourth, and finally, although the prosecutor unfortunately used the phrasing that the defense had failed in its "proof" in this case (in noting the defense's failure to challenge or dispute the prosecution's evidence), the prosecutor did so in the context of also telling the jury, correctly, that "the judge has told you that the defense doesn't have to prove anything, and that's absolutely true. We have to prove to you beyond a reasonable doubt that the defendant committed this crime."

### III. Custody Credit

Both sides agree that because defendant was in presentence custody from October 1, 2009, until March 18, 2011, he is entitled to 534 days of actual custody credit, instead of the 524 days awarded. We will modify the judgment accordingly.

### DISPOSITION

The judgment is modified to add 10 days of actual custody credit, for a total of 534 days. The trial court is directed to prepare an amended abstract of judgment to reflect this modification and send a certified copy to the Department of Corrections and Rehabilitation. As so modified, the judgment is affirmed.

                                                    BUTZ            , J.


We concur:


    RAYE            , P. J.


    NICHOLSON        , J.

10