Filed 2/10/15  In re Arevalos CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ANTHONY AREVALOS<br><br>on<br><br>Habeas Corpus. | D065605<br><br><br>(Super. Ct. Nos. HC21463;<br>SCD233024) |

APPEAL from an order of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Reversed with directions.

Bonnie Dumanis, District Attorney, Laura Tanney, Gary Schons and Martin Doyle, Deputy District Attorneys, for Appellant.

Patrick Morgan Ford, under appointment by the Court of Appeal, for Respondent.

A jury convicted former San Diego Police Officer Anthony Arevalos of numerous crimes in connection with his traffic stops of five female drivers, in which he offered to forego arresting them for driving under the influence (DUI) in exchange for sexual favors.  Arevalos was sentenced to a total of eight years and eight months in prison.

As to victim Jane Doe, the jury found Arevalos guilty of sexual battery by restraint (Pen. Code, § 243.4, subd. (a); count 1),[1] soliciting a bribe (§ 68; count 2), assault and battery by a police officer (§ 149; count 3), and misdemeanor false imprisonment (§§ 236, 237, subd. (a); count 4). Three years of Arevalos' sentence were for count 1, the most serious charge against him among all the victims. Arevalos appealed, challenging the sufficiency of the evidence on counts 1, 3 and 4. He asserted the evidence established Jane Doe impliedly consented to the touching, since he asked to touch her vagina and she did not resist. We affirmed the judgment. (*People v. Arevalos*, D061398 [unpub. opn., Nov. 22, 2013] (*Arevalos I*).)

In this appeal from an order granting Arevalos' habeas corpus petition, the issue is whether the trial court erred by reversing the conviction on counts 1 and 3 on the ground the prosecution violated *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) by not providing the defense with handwritten notes Jane Doe made within 18 hours of the incident at the request of a San Diego police officer. The notes did not mention vaginal touching, but they did mention less egregious aspects of his conduct toward her. Arevalos's trial attorney testified that had she been provided the notes she would have defended him on the ground that no touching occurred, and she would have used the notes to impeach Jane Doe's credibility and show she fabricated the sexual battery to bolster the criminal case and her civil suit against him. We conclude that in light of statements Arevalos made to Jane Doe in a recorded pretext call, there was no *Brady* violation because the notes are

---

[1] All statutory references are to the Penal Code unless otherwise specified.

2

not "material," meaning there is not a " 'reasonable probability that, had [the evidence] been disclosed to the defense, the result . . . would have been different.' " (*In re Sassounian* (1995) 9 Cal.4th 535, 544.) We find error and reverse the order.

FACTUAL AND PROCEDURAL BACKGROUND

I.     *Trial Evidence*[2]

On the evening of March 8, 2011, Jane Doe applied for a job at a restaurant/bar in the Gaslamp Quarter of downtown San Diego. She consumed one drink and one shot at around 6:00 p.m. As part of her interview, between about 8:30 and 10:45 p.m., she was on the bar's Mardi Gras float. She then left to drive to her job as a mental health counselor at a group home.

Arevalos pulled Jane Doe's car over and said she turned left without using a turn signal. She disagreed with him. On inquiry, she claimed she had not consumed alcohol for more than three hours. A breathalyzer test, however, showed she had a blood alcohol content of 0.09 percent, over the legal limit for driving.[3] She told Arevalos she thought drinks that friends had given her that evening were "virgin." Arevalos said he could see she was surprised, but she should not worry because there were "still options." He tested her with a more sophisticated breathalyzer he had in the trunk of his patrol car, and the

2     For convenience, we derive some of the trial evidence from *Arevalos I.* The evidence concerning Jane Doe's encounter with Arevalos came from her testimony and the recorded pretext call.

3     "It is unlawful for a person who has 0.08 percent or more, by weight, of alcohol in his or her blood to drive a vehicle." (Veh. Code, § 23152, subd. (b).)

result was 0.08 percent on the first reading and 0.09 percent on the second reading. At that point, Jane Doe began "freaking out." Arevalos told her not to cry, to calm down, that she had options, and that they "might be able to work something out." He crumpled the breathalyzer results. He asked Jane Doe what she was willing to do and said they could make a deal.

Arevalos told Jane Doe "we had been at this location . . . too long," and "[w]e needed to move . . . because too many people had seen us stop there." He directed her to drive to a nearby 7-Eleven store and he followed her there. He went to her car and asked her what she was "willing to do to get out of the DUI." She responded: "I don't know. What is it that you want?" Arevalos told her that someone had given him a bra and panties in exchange for not getting arrested. Jane Doe said she preferred not to give him her bra because it was new and expensive, but she would give him her panties. Arevalos agreed. He told her she could remove them either in her car or in the 7-Eleven bathroom. He knew people who worked there and he could get the bathroom key. He told her to act like his girlfriend.

Arevalos and Jane Doe entered the 7-Eleven. He obtained the bathroom key and when it became available he opened the door for her. To her surprise, he followed her inside and stood in front of the door. She testified, "He was a cop with a badge and a gun, and I just−once I was in the bathroom, it felt like I had no choice. Like, whatever he had said, I would have had to do because he was—he was the one . . . in charge. He had the power."

Jane Doe took off her jeans and panties and handed the panties to Arevalos. He told her she had "really nice breasts" and he wanted to see them. She raised her shirt and adjusted her bra to briefly expose her breasts, and lowered her shirt. Arevalos then put his hand on her vagina and started to rub it with one of his fingers. She immediately "started to tense up." He said "[i]t will be better if you lean against me." He put his arm around her and pulled her head against his shoulder. After touching her vagina two or three times, he stopped.

After leaving the 7-Eleven, Arevalos told Jane Doe it would take 30 days for the positive breathalyzer results to be removed from the system. He asked for her telephone number, and said that when everything was cleared he would call her and they would meet for coffee. He returned her panties and said, "he didn't need them after all."

After the incident, Jane Doe recounted certain aspects of it to her boyfriend, Brad, a friend, her mother, and her sister. She did not mention the vaginal touching because she felt ashamed and embarrassed. Further, she did not know how Brad would react.

At Brad's urging, Jane Doe reported the incident to the San Diego Police Department. She spoke with two officers and did not mention any touching. On March 9, 2011, San Diego Police Sergeant Peter Brown contacted Jane Doe. He asked her whether Arevalos touched her and she revealed that he touched or penetrated her vagina. She revealed the touching because she did not want to lie to the police.

On March 10, 2011, at the request of San Diego Police Detective Lori Adams, Jane Doe participated in two recorded "pretext calls" to Arevalos. The gist of the first call was that she was concerned he would turn in the DUI paperwork because their deal

5

was for her panties and he had returned them to her. Arevalos assured her that she could trust him and he said he wanted to see her again. They made arrangements to talk again later that evening after he checked his work computer to "see what it says in there about it."

Arevalos telephoned Jane Doe about 30 minutes later. Detective Adams, who was with Jane Doe throughout the call, described her as "[e]xtremely nervous" and "shaking." Jane Doe said to Arevalos, "It just seemed like that you got mad or upset when you stopped touching me." She also said, "I was just surprised that you stopped before I orgasmed, I just figured that's what you wanted." Arevalos did not deny touching her. He responded: "I definitely wanted you to feel good, I definitely wanted that. I just didn't think you had enough time because you were in a rush, you were on the way out. . . . Yeah, that would have been ideal. You know it would have been perfect, would have been cool. But just because that did not happen . . . just because it was just timing. I mean I was trying to get you to work as soon as possible as well."

Jane Doe also said, "[D]id you like it though, I mean . . . I just feel like you didn't like what you were doing to me." Arevalos responded: "You know what, how come. . . . I absolutely did. Well like I said, would I have liked it longer, of course! Of course 'cause I wanted you to . . . to be relaxed during it, and I . . . didn't feel you at all relaxed during it, so I . . . was just like, okay, you know what, let me just stop right now, in my mind, let me just stop right now and then we'll just go forward from here." Jane Doe added, "I mean after all that, it was kind of the work up, I figured I deserved an orgasm, you know." Arevalos responded, "Right. No, ah . . . absolutely! Ab . . . solutely!" He

6

added, "So it's just like well you know, you were busy that night and you had to go to work and . . . so forth, you know I mean . . . . You know . . . that would have been great." He again said, "I wanted you to feel good."

The transcript of the second call includes the following exchange:

"DOE:  . . . So ah . . .  what did you like better, my boobs or my ah . . . the V-jay jay?

"AREVALOS:  [Snickering]  To tell you the truth I like the whole (unin), your whole package, your whole personality, your package, every . . . everything together, very nice.

"DOE:  Oh, come on!  Guys are always one thing or the other. Boobs, ass . . . .

"AREVALOS:  Well, wait a minute.

"DOE:  . . . vagina, one of the things, so what's your favorite, which was your favorite?

"AREVALOS:  [Laughing]  Let's just say ah . . . well, I tell you what, your vagina was very nice, put it that way.

"DOE:  Cool, well I'm glad you thought so.

"AREVALOS:  Very . . . very very nice.

"DOE:  What did you like best?

"AREVALOS:  I was actually . . .  Um . . . you know what I liked the best is when the shirt came up and the pants went down.  I didn't . . . I . . . I didn't expect your body to be as nice and wonderful as it was.

"DOE:  Did that turn you on?  Did you like it?

"AREVALOS:  Yes.  You don't even know how much, very much so.

"DOE:  Which part the most?

7

"AREVALOS: The (unin) . . . the initial time that I . . . that . . . the instant moment that I touched you, the skin texture, the temperature, the way it felt, everything was like perfect.

"DOE: My vagina, right, when you touched that?

"AREVALOS: I mean I . . . What do you want me to tell you? What do you want me to say to you?

"DOE: I . . . I just want to feel that you actually . . . that you got what you wanted. That you . . . that I was enough. That . . . that I . . . that you appreciated me, that I was . . . that my body was good enough.

"AREVALOS: Oh your body's wonderful! Your body was amazing, are you kidding me?"

Jane Doe pressed Arevalos to explicitly admit he touched her vagina. She said, "You're a little dirty one too, touching me down there," and he responded, "I don't know what you're talking about."

The jury was provided with transcripts and audio recordings of the pretext calls. Arevalos' defense was that the vaginal touching was not against Jane Doe's will as required to find him guilty of sexual battery by restraint. (§ 243.4, subd. (a).)[4] His attorney, Gretchen Von Helms, argued "she is in control because she lets him touch her.

---

[4] "Sexual battery is a specific intent crime." (*People v. Chavez* (2000) 84 Cal.App.4th 25, 29.) Section 243.4, subdivision (a) provides in part: "Any person who touches an intimate part of another person while that person is unlawfully restrained by the accused . . . , and if the touching is *against the will* of the person touched and is for the purpose of sexual arousal, sexual gratification, or sexual abuse, is guilty of sexual battery." (Italics added.) "In the context of a sexual assault, 'against the will' of the victim is synonymous with ' "without the victim's consent." ' " (*People v. Babaali* (2009) 171 Cal.App.4th 982, 995.)

8

He asks, and she acquiesces. [¶] When she stiffens, even the slightest, like maybe I don't want to do this after all, he backs off. What does that backing off show? No force. No menace. No violence. If even tensing the body makes that guy back off, that guy is a respectful guy." Von Helms stated, "Not that it didn't happen, but because it was consensual. She just didn't want to admit, I wiggled out of my panties to wiggle out of a DUI." She made no argument the touching did not occur.

II.     *Jane Doe's Notes*

The evening of the incident, Brad gave Jane Doe the telephone number of an acquaintance of his, San Diego Police Officer Kelly Besker. She testified she called Besker and "told him kind of what happened as far as an officer willing to make a deal about getting out of a DUI and what would I do." Officer Besker told her "these are serious allegations, and he listed off all the things I would need to recall as far as the officer's name, what he looked like, the car."

The notes consist of two letter-sized sheets of paper with handwriting on them. Jane Doe wrote the notes within 18 hours of the incident. The notes contain a few phone numbers. It appears she wrote the following information as she was speaking with Officer Besker:

> "__ location
> "__ name of officer
> "__ my car - type
>                 - color
> "__ what 7-11
> "__ discription [*sic*]"

The notes identify "Officer Anthony A." and describe him as a "heavy set" Hispanic person with wavy hair. They describe a car, presumably Jane Doe's car, as a "silver BMW w/black top." The notes state Arevalos "pulled [me] over @ corner of 7th & G" at 10:55 p.m.; he "said I didn't use turn signal"; he "told me he would make me a deal & what was it worth to me"; he "told me another person had given bra/panties & would I be willing to do that"; he "said I could give him my bra & panties," and "I could take them off in the car or go into 7-11 [on J Street] cause he knew the people ther [*sic*] & they would give him the key"; he "told me to act like his gf when we went into 7-11"; he "watched me take them off & said he wanted to see my . . . breasts;" he "gave my my dl back & my panties"; he "told me the record of what I blew was in the machine til about the 24th of the month & asked for my # so he could text me when it was erased"; and "said he would have to explain why a DUI was not made when someone blew over, told me he would say it was just people walking by." The notes do not mention that Jane Doe exposed her breasts on Arevalos' request, that he touched her vagina, or that he put his arm around her and pulled her closer during the touching.

On March 9, 2011, Jane Doe gave the notes to Detective Adams. Detective Adams kept the notes in her case file. She did not provide the notes to the prosecution, and as a result, they were not turned over to the defense. The notes apparently remained in the case file until they were turned over to Arevalos' attorney during discovery in a civil suit Jane Doe filed against him.

III.    *Habeas Corpus Petition*

In July 2013 Arevalos filed a petition for writ of habeas corpus in this court.  He challenged his conviction on counts 1 and 3 on the ground the prosecution violated its obligation under *Brady, supra,* 373 U.S. 83, to turn over to the defense exculpatory, material evidence—Jane Doe's notes.  In October, we issued an order to show cause and ordered the return to be filed with the Superior Court, with instructions that it conduct an evidentiary hearing.  In November, the District Attorney filed its return, and Arevalos filed his traverse.  In February 2014, an evidentiary hearing was held.

The parties stipulated that the only issue for the court's determination was whether Jane Doe's notes are "material" for purposes of a *Brady* violation analysis.  Arevalos argued they are material to impeach her credibility, because the omission of vaginal touching from the notes supports his claim she fabricated the sexual battery to bolster the criminal case and her civil suit against him.  The district attorney argued the notes are not material because in the second pretext call he admitted vaginal touching, and the notes are merely cumulative of other impeachment evidence that Jane Doe did not report vaginal touching to several persons she spoke with after the incident.

The parties stipulated to certain facts and lodged portions of trial testimony and exhibits, including the transcripts and audio recordings of the pretext calls.  Von Helms was the sole live witness.  When asked whether she considered arguing at trial that Arevalos did not touch Jane Doe, she responded, "No.  . . .  I didn't have that ammunition."  Von Helms testified that she would have used the notes to impeach Jane Doe's testimony, and rather than arguing consent, she would have argued the touching

11

never occurred. She conceded that defenses of implied consensual touching and no touching were mutually exclusive.[5]

Von Helms also conceded the second pretext call was "pretty damning." She claimed the call "would have been less damning if I had the notes to indicate that the touching [of] the vagina had not occurred." Further, she acknowledged that at trial she elicited testimony that in the 18 hours initially following the incident, the same period in which Jane Doe wrote the notes, she told several persons about it, but omitted the vaginal touching detail.

After taking the matter under submission, the court granted Arevalos' petition for writ of habeas corpus as to the convictions on counts 1 and 3. The court vacated the judgment on those counts. The court's order states, "the notes could have been used to impeach Jane Doe as to whether or not her claim of vaginal touching was true. Jane Doe was the only live witness to testify about the vaginal touching" and "her testimony and credibility were unique and essential to establishing whether the offense was committed. She was such a crucial prosecution witness that if the jury did not believe her, the jury would not have convicted the petitioner on these counts."

Further, the order states "Von Helms is a very good advocate who would have used the omission [in the notes] to pursue a very different defense strategy. In particular,

---

5       Neither Von Helms, nor Arevalos' attorney at the habeas corpus hearing, suggested Jane Doe's notes were relevant to a defense of consent. Their sole position was that with the notes Von Helms would have *completely changed* the defense to one of no touching.

12

she could have used the notes to frame her arguments and the jury's thinking about the pretext call. The notes would have permitted defense to frame Jane Doe's credibility in a way that the jury was not otherwise challenged to do by the evidence before it. Indeed, the defense in closing argument conceded the touching, arguing instead about whether it was consensual. Thus, the jury was never challenged to consider that it might not have occurred."

The court rejected the People's argument the second pretext call amounts to Arevalos' admission the touching occurred. The order states that "[c]learly the prosecutor could forcefully argue [Arevalos] admitted to the touching based on the overall context of the conversation," and the "jury could have concluded this was an adopted admission. [¶] However, a strong argument could be made that [Arevalos] was merely going along with Jane Doe's tone and topic for the purpose of trying to see her again for another encounter." It also states the "contents of the pretext call are not such as to foreclose any argument that the conversation could be interpreted in different ways. It left room for argument that [Arevalos'] conversation with Jane Doe could have been explained in a way that did not concede the touching."

The court also rejected the People's argument the notes were cumulative to evidence Jane Doe withheld the detail of vaginal touching when she told family and friends about the incident. The order states: "Jane Doe explained that the omission of the touching from her discussions with others about the encounter was due to her embarrassment about what she did to escape the DUI offense, a fact that would not explain her failure to document the touching in her notes. [¶] Jane Doe's failure to

13

include the touching in her notes seems irreconcilable with this explanation. The notes were apparently written while Jane Doe was alone and most likely could have been kept private and undisclosed to anyone at her sole discretion."

Over Arevalos' objection, the court granted the People's request to stay the order pending this appeal.

## DISCUSSION

### I

### *Applicable Law*

In *Brady, supra,* 373 U.S. 83, 87, the United States Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The high court later held the duty to disclose such evidence exists even when the accused has not requested it. (*United States v. Agurs* (1976) 427 U.S. 97, 107.) Further, the duty extends to evidence known to police investigators. (*Kyles v. Whitley* (1995) 514 U.S. 419, 438.) "In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042 (*Salazar*).)

Disclosure is only required if the evidence is "both favorable to the defendant and material on either guilt or punishment." (*In re Sassounian, supra,* 9 Cal.4th at p. 543.) "Evidence is 'favorable' if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses." (*Id.* at p. 544.) "Evidence is 'material' 'only if there is a

14

reasonable probability that, had [it] been disclosed to the defense, the result [of the proceeding] would have been different.' " (*Ibid.*; *United States v. Bagley* (1985) 473 U.S. 667, 682.) "The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court. [Citations.] It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract." (*In re Sassounian, supra,* 9 Cal.4th at p. 544.) The showing of a mere possibility of a different outcome is insufficient. (*Strickler v. Greene* (1999) 527 U.S. 263, 291.)

" 'In general, impeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime," [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case [citations]. In contrast, a new trial is generally not required when the testimony of the witness is "corroborated by other testimony." ' " (*Salazar, supra,* 35 Cal.4th at p. 1050.)

"For purposes of analyzing materiality, we consider both the evidence submitted in support of the petition for writ of habeas corpus and the record of the trial." (*In re Brown* (1998) 17 Cal.4th 873, 888, fn. 8.) " '[T]he reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case.' " (*Id.* at p. 887, citing *United States v. Bagley, supra,* 473 U.S. at p. 683.) In the same vein, "[i]n determining whether there is a reasonable probability that disclosure of [the] evidence would have yielded a different outcome under *Brady,* ' "the court must consider the non-disclosure dynamically, taking

15

into account the range of predictable impacts on trial strategy." ' " (*People v. Gaines* (2009) 46 Cal.4th 172, 184.)

"Under the due process clause of the Fourteenth Amendment to the United States Constitution, a prisoner may seek relief in habeas corpus on the ground that the prosecution did not disclose evidence." (*In re Sassounian*, *supra*, 9 Cal.4th at p. 543.) The petitioner bears the burden of proving his or her claim by a preponderance of the evidence. (*Id.* at pp. 546-547.)

In *Salazar, supra,* 35 Cal.4th 1031, the California Supreme Court addressed the standard of review applicable to a *Brady* claim as follows: "Conclusions of law or of mixed questions of law and fact, such as the elements of a *Brady* claim [Citation], are subject to independent review. [Citation.] Because the [trial court] can observe the demeanor of the witnesses and their manner of testifying, findings of fact, though not binding, are entitled to great weight *when supported by substantial evidence*." (*Id.* at p. 1042, italics added; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176.)

II

*Analysis*

After reviewing the transcript of the second pretext call and listening to the audio recording of the call, we conclude the call indisputably corroborates Jane Doe's testimony that vaginal touching occurred.6 When Jane Doe asked Arevalos if he preferred her

---

6    Von Helms agreed the transcript of the second pretext call matched the audio recording.

16

"boobs" or "V-jay jay," he answered, "I tell you what, your vagina was very nice, put it that way." Without more, the comment could be based on a mere visual, as Von Helms argued at the habeas corpus hearing, but he added, "the instant moment that I touched you, the skin texture, the temperature, the way *it* felt, everything was like perfect." (Italics added.) This comment was in direct response to the question, "Which *part* [did you like] the most?," and he already indicated he preferred her vagina. (Italics added.) In this context, what body part can the term "it" refer to, other than her vagina? Jane Doe had her jeans and panties off, and surely he was not rhapsodizing about the *texture* and *temperature* of her arm or other nonsexual body part. The only evidence of skin-to-skin contact was the vaginal touching. Jane Doe testified Arevalos did not touch her skin when he put his arm around her because she was wearing a shirt.

Further, when Jane Doe asked Arevalos why he stopped touching her before she reached orgasm, he stated, "I definitely wanted you to feel good," and, "that did not happen . . . just because it was just timing." On the subject of orgasm, he also stated, "I just didn't think you had enough time because you were in a rush, you were on the way out. . . . Yeah, that would have been ideal." He also said, "would I have liked *it* longer." (Italics added.) He added, "Of course . . . I wanted you to . . . to be relaxed during *it,* and I . . . didn't feel you at all relaxed during *it,* so I . . . was just like, okay, . . . let me just stop right now."

The term "it" obviously refers to conduct of Arevalos that could have led to Jane Doe's orgasm. There is no suggestion she touched herself during their encounter. Had Arevalos merely looked at her vagina, he and Jane Doe would not have been discussing

17

orgasm, or the lack thereof, and he would have had no reason to offer excuses for discontinuing the conduct.

We acknowledge that the trial court found credible Von Helms's testimony that with Jane Doe's notes she would have changed Arevalos's defense from implied consent to a denial any touching occurred, and it is not our province to reassess witness credibility. (*People v. Guzman* (2011) 201 Cal.App.4th 1090, 1098.) "We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses." (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140; *People v. Taylor* (2009) 47 Cal.4th 850, 896 ["The trial court, which could judge tone, gesture and inflection, as well as the words themselves, was in the best position to make this credibility determination."].)

Given the unambiguous nature of Arevalos's comments in the second pretext call, however, we conclude that even if on retrial Arevalos relinquished a defense of implied consent and defended on the ground no touching occurred, the outcome would not be more favorable to him. Arevalos admitted he touched Jane Doe's skin and went on to describe the texture, temperature, and the way it felt as "like perfect." These explicit statements are so descriptive of vaginal touching, we are satisfied reasonable jurors would reject a defense asserting no touching occurred. Further, as the People point out, "The significance of Arevalos' response as to why he stopped before [Jane] Doe achieved orgasm seems to have been lost on the trial judge. If not an admission of touching her vagina, then what?" Thus, the omission of any reference in Jane Doe's notes to touching does not provide a ground for successful impeachment, nor would it result in a different

18

outcome. The court's order does not discuss how Arevalos' comments could pertain to anything but vaginal touching, and it appears to be based on his lack of express admission, "I touched your [Jane Doe] vagina."

Likewise, even if on further reflection counsel decided to rely on a consent defense at a new trial, it would be unsuccessful.[7] The jury rejected consent in the first trial. The fact Jane Doe's notes do not mention touching does not change the meaning of the touching Arevalos described in the second pretext call.

Arevalos simply did not show by a preponderance of the evidence that Jane Doe's notes were material within the meaning of *Brady*. The "requisite 'reasonable probability' is a probability sufficient to undermine[] confidence in the outcome on the part of the reviewing court" (*In re Sassounian*, *supra*, 9 Cal.4th at p. 544), and we do not lack confidence in the outcome.

We also conclude the court erred by finding that "in terms of timing, the notes are strong impeachment of a prior inconsistent statement." The court noted they "were prepared by Jane Doe within 18 hours of the offense, when it was still fresh in her mind and the details were clear." There is a hearsay exception for prior inconsistent statements. (Evid. Code, § 1235 ["Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing."].) Hearsay was not at issue here, and at any rate, the notes do not deny

---

7    Von Helms conceded she could not logically defend Arevalos on dual grounds—that no touching occurred, but if touching did occur, it was consensual—as the defenses are mutually exclusive.

19

Arevalos touched Jane Doe's vagina.  The notes do not contradict her testimony or anything she said to friends, family or police officers regarding the incident.[8]

DISPOSITION

The order is reversed.  The matter is remanded to the trial court with directions to enter an order denying the petition.

McCONNELL, P. J.

I CONCUR:

HALLER, J.

---

[8]    The People assert the court erred by rejecting their argument Jane Doe's notes lack materiality because they are cumulative to evidence adduced at trial.  We need not address the issue because even if the notes are not cumulative our holding would be the same.

McDONALD, J., Dissenting.

I part company with the majority opinion over what I believe to be the only—and dispositive—issue presented in this appeal: whether the tapes from the pretext phone calls provided such overwhelming evidence of Arevalos's guilt that the trial court erred when it concluded the failure to disclose Jane Doe's notes addressed to the police, with the attendant impeachment value the notes would have provided the skillful and determined defense attorney who represented Arevalos, rendered the verdict unworthy of confidence. To articulate my disagreement with the majority's conclusion, I first explain how I believe this court *should* view the facts, and then examine what I believe to be the *controlling precedents* and how those standards should be applied, after which I explain why the facts (properly viewed) and case law (properly applied) compels me to conclude the trial court correctly found that failure to turn over the notes to the defense created a reasonable probability of a different and more favorable trial result.

I

FACTUAL CONTEXT

The majority's opinion appears to summarize the facts in the light most favorable to the judgment of conviction, rather than (as I believe we must) summarizing the facts in the light most favorable to the appealed-from judgment, i.e., the trial court's order granting Arevalos's motion for new trial.[1]  (See, e.g., *In re Pratt* (1999) 69 Cal.App.4th

---

[1]     For example, the majority's opinion states Arevalos "put his hand on her vagina and started to rub it" (maj opn. *ante,* at p. 5) rather than stating this was what the victim *claimed* occurred; the majority opinion truncates its description of the taped phone

1294, 1314 [" 'the usual rule, that "evidence must be taken most strongly in support of the order appealed from and conflicts must be resolved in favor of respondent," is applicable on habeas corpus review. [Citation.]' "].) Because I believe the facts should be stated most favorably to the trial court's order, I view the factual milieu as follows.

A. The Alleged Touching

Jane Doe testified she and Arevalos went to a 7/Eleven store and, when the bathroom became available, he opened the door for her and followed her inside. Jane Doe took off her panties and handed them to Arevalos, who told her she had "really nice breasts" and he wanted to see them. Jane Doe lifted her shirt and lifted her breasts out of the bra. Jane Doe testified Arevalos then went over to her, put his hand on her vagina and started to rub her vagina with one of his fingers. She further testified Arevalos then put his arm around her and said, "It will be better if you lean against me" and pulled her against his shoulder. Jane Doe testified she did not feel free to leave the bathroom.

After leaving the 7/Eleven store, Arevalos told Jane Doe that it would take 30 days for the positive breathalyzer test results to be removed from the system and asked for her

conversations, describing only those aspects supporting the judgment of conviction and noting Arevalos "did not deny touching her" (maj. opn. *ante,* at p. 6) but overlooking those portions of the phone calls that support the trial court's finding below that, because Arevalos never expressly admitted touching her vagina, the tape was open to more than one interpretation and "the defense could have reasonably argued that the tape was ambiguous and equivocal" and "as such, it cannot be said that apart from Jane Doe's testimony, there was overwhelming evidence of guilt [from] the pretext call"; and the majority opinion highlights that defense counsel *at trial* posited a defense that the "vaginal touching was not against Jane Doe's will" and "made no argument the touching did not occur" (maj. opn. *ante,* at pp. 8, 9), without explaining what relevance defense counsel's strategy *without the notes* might have to our analysis when, as the trial court found, defense counsel would have pursued the opposite argument had she been equipped with the notes.

2

phone number to contact her when this occurred. He said he would call her and meet her for coffee when everything was cleared. Arevalos returned Jane Doe's panties. (*People v. Arevalos* (Nov. 22, 2013, D061398) [nonpub. opn.], at pp. 2-5.)

B. The *Brady*[2] Material[3]

Immediately after Jane Doe drove away from the 7/Eleven store, she called her boyfriend (Brad) and told him a "modified version" of what had happened. She told Brad that Arevalos had made her "flash" him and give her panties to him, but testified she did not reveal Arevalos had touched her because she was embarrassed. Brad told her she needed to report it, sent her the contact information for a police officer he knew (Officer Besker), and told Jane Doe to call Besker.

Jane Doe called Besker for advice on the matter, and asked if she could still be prosecuted for a DUI violation, but did not go into details of what had happened and (again) did not reveal Arevalos's alleged touchings. Besker told her these were serious allegations, and that she would need to record the relevant facts, including the officer's name, what he looked like, and the car, because these were questions she would be asked by police. Besker also gave her a phone number to call.

After working her night shift, and during the initial 18-hour period following her encounter with Arevalos, Jane Doe prepared two pages of handwritten notes regarding the incident, including the time and place of the initial stop; the conversation in which he

---

2      *Brady v. Maryland* (1963) 373 U.S. 83.

3      The facts concerning the *Brady* material, as well as the remaining facts, are drawn from the habeas proceedings that are the subject of the present appeal.

stated that he would make a deal, another person had given him her bra and panties, and asked whether she would be willing to do that; the drive to the 7/Eleven on J Street; Arevalos's statements that she could remove the underwear in the car or go into the 7/Eleven and she should act like his girlfriend when they went inside; he watched her as she took off her panties and said he wanted to see her breasts; he then bought her coffee and had her blow another breathalyzer; and he returned her panties to her. The notes also chronicled the later events: Arevalos later texted her, asking that she text him when she got to her job and to erase his text, and saying he would contact her at the end of the month to let her know when the offending readings on the breathalyzer had been erased.

The description of Arevalos's contact with Jane Doe contained in these notes made no mention of Arevalos touching her vagina. Jane Doe gave her notes to police on the evening of March 9, 2011, but police never turned them over to the prosecutor.

C. The Duplicative Trial Evidence: Omission of Touching in Other Statements

Jane Doe first mentioned the vaginal touching on the evening of March 9, 2011, approximately 18 hours after the incident, when she was contacted by a Sergeant Brown about the incident. When Detective Adams arrived later that night to interview Jane Doe, she again described the vaginal touching.

In the approximately 18 hours between the incident and her conversation with Brown, Jane Doe had talked to several people about what occurred during the encounter. She admitted she made no mention of the vaginal touching during those conversations.

4

D. <u>The Corroborative Trial Evidence: The Taped Pretext Calls</u>

At the request of a police detective, Jane Doe arranged two separate pretext phone calls with Arevalos the next evening. The gist of the first call was that she was concerned he would turn in the DUI paperwork because their deal was for her panties and he had returned the panties. Arevalos assured her that she could trust him, he was willing to give her a break, and he knew how to manipulate the DUI paperwork so that "nobody knows about it," and offered to meet with her for coffee to explain how he would successfully manipulate the process. When she reiterated that she was still "nervous" and wanted to "make sure the deal's still on even though you gave [the panties] back," Arevalos assured her the deal was still on. He later told her that he was about to begin his shift but could phone her later to tell her "what's going on." When she then asked if he had a girlfriend, explaining she wasn't sure if the "coffee thing" meant he was going to "pick [her] up or ask [her] out," he said "[w]ell you told me you had a boyfriend," but she said the boyfriend was a "commitment phobe." He assured her he would call her later that night and, when she expressed continued anxiety over the potential DUI, reassured her he would be able to explain things in a way "that's gonna make you very calm" and, "Just relax, okay?"

When Arevalos returned Jane Doe's call later that night, she again expressed her concern that, because "you gave the panties back" and "you had said you *wanted* to touch me *and then you stopped*" (italics added), she wanted "to make sure . . . [¶] . . . [¶] . . . that what I did was enough." During this second call, Jane Doe made several references that directed the conversation toward Arevalos's touching of her when in the bathroom,

5

but Arevalos's responses were ambiguous.  For example, after he made a lengthy statement explaining why he decided to let her go and why she should not be worried about his reneging on his promise, she said "it just seemed . . . you got mad or upset when you stopped touching me," and Arevalos replied, "No . . . no . . . no . . . .  I don't want you to think that.  There's no ill will in my mind whatsoever right now.  No negativity in my mind whatsoever. . . .  I'm just trying to put you at ease that when I do see you again in person, . . . it's gonna be a good meeting . . . where I'm gonna say, guess what, everything is totally erased . . . ."  When she replied that she expected him to "keep going with the touching" and was worried that because "you stopped that the deal might not work," he replied, "You know I told you, you know, are you comfortable.  'No, I'm not comfortable and stuff,' so I didn't want to make you so uncomfortable that, you know that . . . it's gonna be okay."

In another passage, after Arevalos reassured her he was not going to report the stop and she could trust him, Jane Doe said she was "surprised that you stopped before I orgasmed, I just figured that's what you wanted," and Arevalos replied, "I definitely wanted you to feel good . . . .  I just didn't think you had enough time because you were in a rush, you were on the way out.  You know I mean, I . . . I . . . I . . . .  Yeah, that would have been ideal.  You know it would have been perfect, would have been cool.  But just because that did not happen . . . just because it was just timing.  I mean I was trying to get you to work as soon as possible as well. . . .  I mean understand that, right?"  She assured him she understood but asked "did you like it though, I mean I don't . . . I just feel like you didn't like what you were doing to me," and he replied "I . . . I . . . I

6

absolutely did.  Well, like I said, would I have liked it longer, of course!  Of course 'cause I wanted you to . . . be relaxed during it, and I . . . I didn't feel you at all relaxed during it, so I . . . I was just like, okay, . . . let me just stop right now, in my mind, let me just stop right now and then we'll just go forward from here."

After Arevalos asked about Jane Doe's boyfriend and stated he wanted to meet with her once he could assure her that the DUI was "100 percent clear," she said, "Yeah, definitely.  I just . . . .  I mean after all that, it was kind of the work up, I figured I deserved an orgasm, you know," and he replied, "Right. No, ah . . . absolutely! . . .  You know I mean I . . . I don't know you know what's a good time for you. . . .  [¶] . . . [¶] . . . I wanted you to feel good," and Jane Doe replied "I did.  I just, you know you're a cop, its intimidating, it's a little overwhelming.  [¶] . . . [¶]  And then it's crazy that I was standing there with no panties on."  Arevalos replied that she had handled it "very well" and if she wanted to meet again when everything "on this end is tied up and taken care of . . . we'll like have closure . . . , how's that?"  Jane Doe then said "you said you liked my boobs before I lifted 'em up, but you didn't say anything afterwards.  Did they look okay?"  He replied, "Well, I didn't want. . . .  Absolutely girl! . . .  I thought you were a very beautiful woman and I wanted to please you in every way . . . .  And I didn't want to say anything that would disturb you.  I didn't want to say anything that would make you uncomfortable, but it's hard . . . 'cause I don't really know you . . . ."  She then followed up by asking whether he liked her breasts or vagina better, and he replied "your whole package," but when she insisted "[g]uys are always one thing or the other . . . [¶] . . . [¶] so what's your favorite," he replied "your vagina was very nice."  When she asked again

7

"[w]hat did you like best," he replied "what I liked the best is when the shirt came up and the pants went down." She asked "[d]id that turn you on?" and he replied "very much so." She again asked "[w]hich part the most," and he replied "the initial time that I . . . that . . . the instant moment that I touched you, the skin texture, the temperature, the way it felt, everything was like perfect." She then said "[m]y vagina, right, when your touched that?" but Arevalos demurred saying, "What do you want me to tell you? What do you want me to say to you?"

During the balance of the phone call, Jane Doe again attempted to elicit Arevalos's admissions of wrongdoing. However, Arevalos either denied or deflected the gist of each of these forays. For example, she asked whether he had met other girls who were "as crazy as me" and had showed their breasts to him, and he said no. She asked if she'd been the only one "in that bathroom" and he said yes. She asked if he'd gone back to the bathroom later to "finish yourself," and he laughed and responded "you are crazy" and "I'm not gonna respond to that . . . until I'm face to face with you." When she chided, "Oh come on, you know you went back in there thinking about me, huh? Thinking about touching me, wishing I was still in the bathroom with . . . my cute little vagina," he again laughed and responded "I'm not gonna respond to that young girl." When she laughed and said "I'm not the only crazy one. You're a dirty little one, touching me down there," Arevalos specifically responded "*I don't know what you're talking about.*" (Italics added.)

8

E. <u>Evidence at Habeas Hearing</u>

At the habeas hearing, the only witness providing live testimony was Arevalos's counsel from his underlying criminal trial, Ms. Von Helms. Von Helms testified her defense at trial had been to argue "consent" and she never attempted to argue the touching did not occur because she had no evidence to support that defense. However, had she been given Jane Doe's notes, Von Helms testified she "*absolutely*" would have used the notes to change the defense to argue the alleged sexual touching had not occurred. Von Helms conceded that, at trial, other witnesses testified Jane Doe had talked to them about the stop but had not mentioned the vaginal touching, but Von Helms explained that Jane Doe's trial explanation for that omission was that she was embarrassed to tell these people because they were not police. However, Von Helms explained that explanation would not have applied to omitting the touching from notes Jane Doe prepared for herself to aid the police investigation.

Von Helms observed the notes would have provided her with powerful impeachment, and were "[a] ten for sure" on a scale of one to 10, which she could have used to extensively cross-examine both Jane Doe and the police to show the "touching" claim was a late addition to her description of events, and would have provided fodder for an argument that this was an added embellishment intended to greatly enhance the monetary award in her contemplated civil lawsuit based on Arevalos's conduct. Von Helms noted this jury had looked skeptically on victims who were seeking collateral financial gain, because it acquitted Arevalos of all counts involving another victim who admitted she was going to sue for seven million dollars, and Jane Doe's credibility would

9

have suffered analogous blows because her notes "included everything else in pretty nice detail" but were silent on the touching.

The majority finds significant that Von Helms stated the second pretext call was "pretty damning." (Maj. opn. *ante*, at p. 12.) However, I believe the majority strays when it decontextualizes that phrase to impart to it a meaning that was not intended. The "pretty damning" snippet emerged at the end of a series of questions in which the People asked Von Helms about the statement in mitigation she filed in the underlying criminal action after Arevalos was convicted. That statement in mitigation stated Arevalos had not testified except through the tapes of the pretextual call and he "clearly admitted his conduct." Von Helms explained that Arevalos had been convicted of bribery, and the goal of a mitigation statement was not to reargue the verdict but to instead show he was worthy of leniency, and counsel "had to accept that recorded call" (in which he admitted agreeing to dismiss the DUI in exchange for favors) because the recorded call was "pretty damning." The context of Von Helms's agreement to the "pretty damning" statement makes clear to me, and I believe (from the trial court's implicit finding the pretext calls were not necessarily "damning") it was equally clear to the trial court,[4] that Von Helms

4  I believe our standard of review, which requires that we construe the evidence most strongly in support of the order appealed from (*In re Pratt, supra,* 69 Cal.App.4th at p. 1314) and " '[infer] the trial court made implied findings of fact that are consistent with its order' " (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 531), compels the conclusion that the trial court, by its finding that Von Helms would have changed to a no touching defense, did not find Von Helms's "pretty damning" comment to mean Von Helms "conceded" the taped calls were pretty damning *as to whether the vaginal touching occurred.* Accordingly, I believe the

10

was agreeing the pretext call was "pretty damning" *as to the bribery conviction* and would have been less damning had the defense been given the notes showing no touching had occurred.

## II

## LEGAL FRAMEWORK

A. <u>Substantive Law</u>

I agree with the majority's general overview of the applicable substantive law, but because the parties below agreed *Brady's* first two components (i.e. the notes were favorable and should have been—but were not—disclosed) were met here, I believe the present dispute turns solely on the materiality component, and therefore I believe a more extended examination of the applicable authorities is required.  As stated in *In re Brown* (1998) 17 Cal.4th 873, the analysis of the materiality component under *Brady* emphasizes four factors:

> "First, '[a]lthough the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant).  [Citations.]  [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. *The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence*.' [Citation.]

---

People's reliance on the "pretty damning" comment (see fn. 8, *post*) is misplaced, and the majority's recitation of the "pretty damning" comment seems to be surplusage.

11

"*Second, 'it is not a sufficiency of evidence test*. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' [Citation.]

"Third, 'once a reviewing court applying [the test] has found constitutional error there is no need for further harmless-error review.' [Citation.] The one subsumes the other. [Citation.]

"Fourth, while the tendency and force of undisclosed evidence is evaluated item by item, its cumulative effect for purposes of materiality must be considered collectively." (*In re Brown, supra,* 17 Cal.4th at pp. 886-887, italics added.)

The reasonable probability of a different result is "assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract." (*In re Sassounian* (1995) 9 Cal.4th 535, 544.) For example, where the prosecution did not disclose impeachment evidence as to a witness who provided crucial evidence of guilt, and the remaining evidence on the critical issue was relatively weak, a court may conclude there was a reasonable probability of a different result sufficient to undermine confidence in the outcome had the evidence been disclosed. (*In re Pratt, supra,* 69 Cal.App.4th at pp. 1312, 1315-1322.) In contrast, the nondisclosure of documents prepared by a witness (and a detective's notes of interviews with her) that could have impeached significant portions of her testimony was found harmless in *Strickler v. Greene* (1999) 527 U.S. 263 because the totality of the relevant circumstances, including the testimony of three other witnesses placing the defendant

12

around the crime scene and the "considerable forensic and other physical evidence linking [the defendant] to the crime," convinced the court it was not reasonably probable the defendant would have obtained a more favorable result even had the witness been discredited.  (*Id*. at p. 294 [totality of evidence "provides strong support for the conclusion that petitioner would have been convicted of capital murder and sentenced to death, even if [the witness] had been severely impeached"].)  Similarly, the nondisclosure of the fact a jailhouse informant was promised benefits from the authorities in exchange for his testimony, which could have been used as additional impeachment, was found harmless where the informant was so "extensively impeached" at trial that "the 'testimonial thread' that [the informant] plied [at trial was already] severely 'tattered' " (*In re Sassounian,* at p. 548), and the totality of the other evidence convinced the court that "[e]ven without [the informant's] testimony, [the] overwhelming evidence support[ed] only one reasonable inference as to the national-origin special circumstance."  (*Id*. at p. 549.)  Under those circumstances, the court concluded nondisclosure of impeachment evidence was harmless.  (*Id*. at p. 550 ["Because it is not reasonably probable that he could have obtained a different result in the absence of [the informant's] testimony in its entirety, it is not reasonably probable that he could have obtained a different result in the absence of evidence that would merely have subjected [the informant] to impeachment— or better, *further* impeachment [citation]."].)

Importantly, a reasonable probability "in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility.*  ([*People v. Watson* (1956) 46 Cal.2d 818,] at p. 837; cf. *Strickland v. Washington* (1984) 466 U.S.

13

668, 693-694 ['reasonable probability' does not mean 'more likely than not,' but merely 'probability sufficient to undermine confidence in the outcome'].)" (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) A hung jury is undeniably a different and better result than a conviction, and I conclude a defendant satisfies his or her burden of showing the requisite reasonable probability if there is a reasonable chance that a single rational juror would have voted differently, and a hung jury thereby resulted, absent the error. (*People v. Soojian* (2010) 190 Cal.App.4th 491, 519-521; accord, *People v. Mason* (2013) 218 Cal.App.4th 818, 826.)

      B. <u>The Standard for Our Review</u>

      I am satisfied the majority opinion states the controlling standard of review under the language of *People v. Salazar* (2005) 35 Cal.4th 1031, 1042. Although I recognize *Salazar* instructs we are not to accord any deference to the trial court's conclusion as to prejudice because *Salazar* states we are to apply de novo review to this issue (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), I am somewhat discomfited that, under the particular facts of this case (which makes it factually distinguishable from the facts considered in *Salazar*), a quirk of timing has radically shifted our standard of review. Specifically, and unlike *Salazar*, the same judge who presided over Arevalos's criminal trial also heard the instant habeas petition, concluded there was a reasonable probability of a different result had the newly discovered evidence been available to the defense at trial, and granted Arevalos a new trial. Had the notes come to the attention of the defense in time to present the *same* arguments by way of a motion for new trial based on newly discovered evidence, and the *same* trial judge made

14

the *same* finding of prejudice and granted the *same* relief, our review of that order would require that we accord deference to those determinations and only reverse for a manifest abuse of discretion (see, e.g., *People v. Verdugo* (2010) 50 Cal.4th 263, 308) because the trial judge, having heard the evidence, is in best position to evaluate prejudice from the error. (Cf. *People v. Trinh* (2014) 59 Cal.4th 216, 251.) Were I free to select the appropriate standard of review, I would not, under the peculiar facts of this case, depart from the ordinary deferential standard of review based solely on the *timing* of the instant application.

III

ANALYSIS

The foregoing is my admittedly long-winded way of setting what I believe to be the proper context in which our review should be conducted. Certainly, Jane Doe was the *only* live witness at trial who supplied evidence on a critical element of the prosecution's case: testimony that the sexual touching occurred. I also believe the undisclosed evidence provided substantial grist for impeaching that critical testimony because the notes contain no mention of the touching, even though it otherwise contained significant details concerning their remaining interactions during that evening.[5] Accordingly, I

---

[5] The trial court recognized that, because of the timing of and purposes for which the notes were prepared, a significant argument could be made that had the touching occurred, "she would likely have included the touching along with other, specific facts in her narrative." I agree with that assessment because the notes showed Jane Doe did chronicle the time and place of the stop, the explanation given to her for the stop, Arevalos's offer to make a deal for her bra and panties, and that she could remove them in her car or go to a 7/Eleven where he could obtain a bathroom key from people he knew

15

believe the proper inquiry should be whether, assuming the defense had been given the notes and in fact used them to impeach Jane Doe in pursuit of a defense that her claims of a sexual touching lacked credibility, there is a "reasonable probability" or, stated differently, a "probability sufficient to undermine confidence in the outcome," that at least one juror would not have found, beyond a reasonable doubt, Arevalos committed the sexual touching.

In this context, I note both the United States Supreme Court and our own high court have recognized that, " ' "[i]n general, impeachment evidence has been found to be material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime' [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case [citation]." ' [Quoting *People v. Salazar, supra,* 35 Cal.4th at p. 1050.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 177 [dicta].) In its recent and near unanimous decision in *Smith v. Cain* (2012) ___ U.S. ___ [132 S.Ct. 627], the United States Supreme Court reversed a conviction under *Brady* because notes that could have impeached the critical testimony of the sole witness providing evidence of the defendant's guilt were not turned over to the defense. (*Smith,* at pp. 630-631.) The decisions of California's intermediate appellate courts are in accord. (See, e.g., *In re Pratt, supra,* 69 Cal.App.4th at pp. 1312, 1315-1322.) The majority

---

there. The notes also recorded the ensuing drive to the 7/Eleven, that he told her to act like his girlfriend when they went inside the 7/Eleven, the fact he watched her remove the panties and his statement he also wanted to see her breasts, that he bought her coffee and then readministered the breathalyzer and returned her panties, that he asked for her phone number so he could text her when the computer record of the DUI was erased, and that he did later text her.

16

opinion recognizes the guidance provided by these cases (maj. opn. *ante*, at p. 16), but apparently concludes they are inapposite because the majority construes the taped calls as providing unambiguous corroboratory evidence of the touching.

The facts presented here involved depriving the defendant of significant favorable evidence, because the notes could be construed as recording Jane Doe's *chronology* of the events of that night. The notes' silence on the most egregious alleged sexual misconduct, especially when contrasted with the fact the *same* notes adverted to the *less* egregious sexual misconduct (of requesting her panties and asking to see her breasts), provided fertile grounds for impeaching the only witness providing critical evidence. Accordingly, I would conclude there was a reasonable probability of a different result had the evidence been disclosed, which is sufficient to undermine my confidence in the outcome within the meaning of *Brady*, unless we can confidently conclude, as does the majority here, that "[e]ven without [Jane Doe's] testimony [about the touching, the taped calls provide] overwhelming evidence support[ing] only one reasonable inference" (*In re Sassounian,* 9 Cal.4th at p. 549), i.e., that the touching occurred.

The People argue there was no *Brady* violation because there was no reasonable probability Arevalos would have obtained a more favorable result had the notes been provided to defense counsel, as required by *Brady*. The People assert (1) the closely analogous facts in *Strickler v Greene, supra*, 527 U.S. 263 demonstrate the notes do not satisfy the materiality prong of *Brady*, (2) the notes had only "marginal" impeachment value, (3) the notes were cumulative to the evidence (introduced at trial) concerning statements Jane Doe made to various third parties, and (4) there was such overwhelming

17

evidence of his guilt in the form of Arevalos's admissions during the pretext calls that the notes cannot be deemed material under *Brady*.[6]

I am not persuaded by the People's argument that the facts in *Strickler v Greene, supra*, 527 U.S. 263 are so closely analogous that it compels the conclusion the notes do not satisfy the materiality prong. In *Strickler*, the nondisclosed evidence *was* closely analogous: documents were prepared by a witness (and a detective's notes of interviews with her) that could have impeached significant portions of her testimony. However, *Strickler's* determination that there was no *Brady* violation was because the court was convinced the totality of the relevant circumstances, including the testimony of three other witnesses placing the defendant around the crime scene and the "considerable forensic and other physical evidence linking [the defendant] to the crime" (*Strickler,* at p. 298), made it not reasonably probable the defendant would have obtained a more favorable result even had the witness been discredited. (*Strickler,* at pp. 263, 292-294.) Here, there was no forensic or other physical evidence demonstrating a vaginal touching,

---

[6]    The People argue, apparently for the first time on appeal, the trial court should have considered the nondisclosure of the notes "dynamically, taking into account the range of predictable impacts on trial strategy," citing dicta in *People v. Gaines* (2009) 46 Cal.4th 172, 184, and the trial court's failure to do so was error. The People argue the court should have evaluated whether, even had the notes been made available to the defense, a reasonably competent defense attorney would still have pursued the consent theory of defense rather than a "no touching" defense. Even assuming the argument is preserved, and even assuming this claim did not rest on what I believe to be a fundamental misconstruction of the language quoted by *Gaines*, I believe the record makes clear the trial court *did* consider and reject the claim that Von Helms, if given the notes, would nevertheless still have pursued the consent theory of defense rather than a "no touching" defense.

18

and there was no other witness at trial who testified to seeing the touching. Accordingly, *Strickler* provides no guidance here.

The People also argue the notes, although favorable to Arevalos, had only "marginal" impeachment value because the provenance for the notes show Jane Doe did not intend these notes to be a comprehensive accounting of the events, but were only to spur her memory of events, and therefore her omission of the most egregious misconduct—which she would not have forgotten—was discountable because the omission would be subject to a perfectly benign explanation. However, because the notes were *not* disclosed, the People's speculation about what Jane Doe *might* have explained about her state of mind (and the purpose she had) when making these notes and/or her explanation for why she included many details but omitted others, and the jury's assessment of the relative credibility of these possible explanations, was not (and could not have been) explored at trial. An argument parallel to the argument advanced here by the People was advanced by the state in *Smith v. Cain, supra,* ___ U.S. ___ [132 S.Ct. 627], to support its claim the undisclosed statements impeaching the witness (Boatner) were not material, and that argument was rejected by the United States Supreme Court as follows:

> "The State and the dissent advance various reasons why the jury
> might have discounted Boatner's undisclosed statements. They
> stress, for example, that Boatner made other remarks on the night of
> the murder indicating that he could identify the first gunman to enter
> the house, but not the others. That merely leaves us to speculate
> about which of Boatner's contradictory declarations the jury would
> have believed. The State also contends that Boatner's statements
> made five days after the crime can be explained by fear of
> retaliation. Smith responds that the record contains no evidence of

19

any such fear. Again, the State's argument offers a reason that the jury *could* have disbelieved Boatner's undisclosed statements, but gives us no confidence that it *would* have done so." (*Id*. at p. 630.)

I believe the rationale of *Smith v. Cain, supra*, is compelling: the speculation by the People about what role these notes might or might not have been intended by Jane Doe to serve, in addition to resting on pure surmise and conjecture, at best provides an argument there might be "reason[s] [a] jury *could* have [concluded the omission to be innocuous], but gives us no confidence that it *would* have done so." (*Smith v. Cain, supra,* ___ U.S. ___ [132 S.Ct. at p. 630].)

The People next assert, relying on *In re Sassounian, supra,* 9 Cal.4th 535, that the notes do not satisfy the materiality prong of *Brady* because the notes were cumulative to the evidence (introduced at trial) of statements she made to various third parties in which she also omitted any mention of the vaginal touching. I am unconvinced the notes may be deemed immaterial as cumulative under *Sassounian*, for several reasons. First, the evidentiary landscape in which *Sassounian* reached its conclusions, and the rationale it employed, find no counterpart here. In *Sassounian*, the court examined the failure to disclose impeachment evidence—promises of benefits in exchange for testimony (*id.* at p. 542)—as to the credibility of a jailhouse informant (Busch) who claimed the defendant confessed to the crime and to its national-origin motivations. (*Id*. at pp. 539-540.) *Sassounian* concluded the nondisclosure was harmless in part because the undisclosed information merely involved additional impeachment for a witness who had already been so "extensively impeached" that "the 'testimonial thread' that he plied [was already] severely 'tattered' " that it was "hard to assign a weight" to the impact Busch's testimony

20

actually had on the critical issues.  (*Id.* at pp. 548, 547.)  More importantly, *Sassounian* stated that "[s]eparate and apart from Busch's testimony, . . . there was overwhelming evidence relating to the crime" (*id.* at p. 548) and "[e]ven without Busch's testimony, [the] overwhelming evidence supports only one reasonable inference as to the national-origin special circumstance," and ultimately concluded that "[i]n a word, 'there was nothing "close" about this' issue."  (*Id.* at pp. 549, 548.)  Neither factor applies here: the weight of Jane Doe's credibility was essential here, and there was not overwhelming evidence supporting only one reasonable inference without assigning weight to Jane Doe's testimony.  Although the majority opinion *cites Sassounian*, it is silent on how *Sassounian* is sufficiently analogous to provide support for the majority's conclusion.

Second, I am unconvinced by the People's argument that Jane Doe's omission of the touching from the notes she made within the first 24 hours of the alleged touching was "the exact same thing" as the evidence, introduced at trial, that she also omitted any mention of the touching when she told several family members and friends about her encounter during this same period.  However, the trial court concluded, and I agree, the notes were of a *substantially different* ilk than the evidence of her conversations with third parties.  Although Jane Doe could provide a plausible explanation for why she omitted any mention of the touching during her conversations with her mother, sister, boyfriend and coworker, and at trial apparently did tender her "embarrassment" about her conduct to excuse the omission during those conversations, the same embarrassment explanation could have rung hollow if tendered to a jury to rationalize the omission of the touching from notes, which were apparently not written with the intent or expectation

21

they would be published to her family or friends. I cannot conclude the notes were simply duplicative of the testimony at trial about her conversations with family and friends.

The People's final argument, on which the majority's decision turns, is that the pretext phone calls provided overwhelming evidence of Arevalos's guilt because his own words corroborated the touching, and therefore failure to disclose the notes could not have had any impact on the ultimate verdict. The People concede (and the taped transcript confirms) Arevalos never expressly stated he touched Jane Doe's vagina or unequivocally agreed with Jane Doe's statements about his "touching me down there,"[7] but contend Arevalos's statements during the pretext call "have but one reasonable interpretation[: that] Arevalos touched Doe's vagina."[8]  I have independently reviewed both pretext calls and, like the trial court below, I conclude the tapes are susceptible to more than one interpretation. Certainly, Arevalos neither expressly agreed he touched her vagina, nor did he expressly deny touching her vagina, and there are passages from

---

[7]     In the only two passages with express references by Jane Doe to Arevalos's touching her vagina, the tape recorded calls showed Arevalos's first response (in reaction to her question whether the part he liked the most was "[m]y vagina, right, when you touched that?") was "[w]hat do you want me to tell you?  What do you want me to say to you?" and in his second response (in reaction to Jane Doe's statement that he was "a dirty little one, touching me down there") he stated "I don't know what you're talking about."

[8]     On appeal, the People argue that, in defense counsel's testimony at the habeas hearing, "even Ms. Von Helms was forced to acknowledge that [Arevalos's] pretextual phone call was 'pretty damning,' " and hence provided overwhelming proof of his guilt. For the reasons previously stated, it is clear to me (as well as to the trial judge who heard the testimony relied on by the People) that Von Helms was not agreeing the recorded call was damning on whether Arevalos touched Jane Doe's vagina.

22

which a prosecutor could argue that some of the statements, in context, constituted an implied admission to the touching. However, I also note the tape revealed that Arevalos's tone was never hostile or guarded, and the tenor and content of his statements could provide for a substantial defense argument that he was merely trying to reassure a distraught and anxious woman that her DUI was going to disappear and, as Jane Doe's topics progressed and became more risqué and flirtatious, that he was following her lead and became more flirtatious in pursuit of another encounter. I cannot conclude that, considering the omission of the touching from the notes, no reasonable juror could have had a reasonable doubt about whether the tape was ambiguous and equivocal. I therefore agree with the trial judge and cannot confidently say that, apart from Jane Doe's testimony, there was overwhelming evidence of Arevalos's guilt in those pretext calls.

I conclude the notes were favorable to Arevalos because they provided grounds for impeaching Jane Doe, that evidence was suppressed (albeit inadvertently) by the People, and the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (*Kyles v. Whitley* (1995) 514 U.S. 419, 435, fn. omitted.) I would affirm the trial court's order granting Arevalos's petition and ordering a new trial on the relevant counts.


McDONALD, J.


23